1  Michael R. Lozeau (State Bar No. 142893)
   Richard T. Drury (State Bar No. 163559)
2  Douglas J. Chermak (State Bar No. 233382)
   LOZEAU DRURY LLP
3  410 12th Street, Suite 250
   Oakland, CA 94607
4  Tel: (510) 836-4200
   Fax: (510) 836-4205 (fax)
5  E-mail: michael@lozeaudrury.com
           richard@lozeaudrury.com
6          doug@lozeaudrury.com

7  Attorneys for Plaintiff
   CALIFORNIA SPORTFISHING
8  PROTECTION ALLIANCE

*FILED*

JAN 25 2013

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

9           **UNITED STATES DISTRICT COURT**

10          **NORTHERN DISTRICT OF CALIFORNIA**

11  CALIFORNIA SPORTFISHING          Case No. **C13-0362** JCS
    PROTECTION ALLIANCE, a non-profit
12  corporation,

13          Plaintiff,                **COMPLAINT FOR DECLARATORY AND
                                       INJUNCTIVE RELIEF AND CIVIL
14                                     PENALTIES**

    vs.

15  COUNTY OF SONOMA,                 (Federal Water Pollution Control Act,
                                      33 U.S.C. §§ 1251 to 1387)
16          Defendant.

17

18

19          CALIFORNIA SPORTFISHING PROTECTION ALLIANCE ("CSPA"), a California non-

20  profit corporation, by and through its counsel, hereby alleges:

21  **I.    JURISDICTION AND VENUE**

22          1.      This is a civil suit brought under the citizen suit enforcement provisions of the

23  Federal Water Pollution Control Act, 33 U.S.C. § 1251, *et seq.* (the "Clean Water Act" or "the

24  Act"). This Court has subject matter jurisdiction over the parties and the subject matter of this

25  action pursuant to Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A), and 28 U.S.C. § 1331

26  (an action arising under the laws of the United States). The relief requested is authorized pursuant

27  to 28 U.S.C. §§ 2201-02 (power to issue declaratory relief in case of actual controversy and further

28  necessary relief based on such a declaration); 33 U.S.C. §§ 1319(b), 1365(a) (injunctive relief); and

COMPLAINT

1  33 U.S.C. §§ 1319(d), 1365(a) (civil penalties).

2      2.    On or about November 9, 2012, Plaintiff provided notice of Defendant's violations of

3  the Act, and of its intention to file suit against Defendant, to the Administrator of the United States

4  Environmental Protection Agency ("EPA"); the Administrator of EPA Region IX; the Executive

5  Director of the State Water Resources Control Board ("State Board"); the Executive Officer of the

6  California Regional Water Quality Control Board, San Francisco Bay Region ("Regional Board");

7  and to Defendant, as required by the Act, 33 U.S.C. § 1365(b)(1)(A). A true and correct copy of

8  CSPA's notice letter is attached as Exhibit A, and is incorporated by reference.

9      3.    More than sixty days have passed since notice was served on Defendant and the state

10  and federal agencies. Plaintiff is informed and believes, and thereupon alleges, that neither the EPA

11  nor the State of California has commenced or is diligently prosecuting a court action to redress the

12  violations alleged in this complaint. This action's claim for civil penalties is not barred by any prior

13  administrative penalty under Section 309(g) of the Act, 33 U.S.C. § 1319(g).

14      4.    Venue is proper in the Northern District of California pursuant to Section 505(c)(1)

15  of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial

16  district. Pursuant to Local Rule 3-2(d), intradistrict venue is proper in Oakland, California, because

17  the source of the violations is located within Sonoma County.

18  **II.    INTRODUCTION**

19      5.    This complaint seeks relief for Defendant's discharges of polluted storm water and

20  non-storm water pollutants from Defendant County of Sonoma's ("Sonoma" or "Defendant")

21  recycling facility and transfer station located at 4276 Stage Gulch Road in Sonoma, California ("the

22  Facility") in violation of the Act and National Pollutant Discharge Elimination System ("NPDES")

23  Permit No. CAS000001, State Water Resources Control Board Water Quality Order No. 91-13-

24  DWQ, as amended by Water Quality Order No. 92-12-DWQ and Water Quality Order No. 97-03-

25  DWQ (hereinafter the "Permit" or "General Permit"). Defendant's violations of the discharge,

26  treatment technology, monitoring requirements, and other procedural and substantive requirements

27  of the Permit and the Act are ongoing and continuous.

28      6.    The failure on the part of persons and facilities such as Defendant and its industrial

COMPLAINT

2

1  facility to comply with storm water requirements is recognized as a significant cause of the

2  continuing decline in water quality of the San Pablo Bay, the San Francisco Bay ("the Bay") and

3  other area receiving waters. The general consensus among regulatory agencies and water quality

4  specialists is that storm pollution amounts to more than half of the total pollution entering the

5  aquatic environment each year. In most areas of Sonoma County, storm water flows completely

6  untreated through storm drain systems or other channels directly to the waters of the United States.

7  **III.  PARTIES**

8  7.  Plaintiff CALIFORNIA SPORTFISHING PROTECTION ALLIANCE ("CSPA") is

9  a a non-profit public benefit corporation organized under the laws of the State of California with its

10  main office in Stockton, California. CSPA has approximately 2,000 members who live, recreate and

11  work in and around waters of the State of California, including the San Pablo Bay and the Bay.

12  CSPA is dedicated to the preservation, protection, and defense of the environment, the wildlife and

13  the natural resources of all waters of California. To further these goals, CSPA actively seeks federal

14  and state agency implementation of the Act and other laws and, where necessary, directly initiates

15  enforcement actions on behalf of itself and its members.

16  8.  Members of CSPA reside in and around the San Pablo Bay and the San Francisco

17  Bay and enjoy using the Bay for recreation and other activities. Members of CSPA use and enjoy

18  the waters into which Defendant has caused, is causing, and will continue to cause, pollutants to be

19  discharged. Members of CSPA use those areas to fish, sail, boat, kayak, swim, bird watch, view

20  wildlife and engage in scientific study including monitoring activities, among other things.

21  Defendant's discharges of pollutants threaten or impair each of those uses or contribute to such

22  threats and impairments. Thus, the interests of CSPA's members have been, are being, and will

23  continue to be adversely affected by Defendant's failure to comply with the Clean Water Act and the

24  Permit. The relief sought herein will redress the harms to Plaintiff caused by Defendant's activities.

25  9.  Continuing commission of the acts and omissions alleged above will irreparably harm

26  Plaintiff and its members, for which harm they have no plain, speedy or adequate remedy at law.

27  10.  Defendant Sonoma is a county duly organized and existing under the laws of the state

28  of California. Sonoma's Transportation and Public Works Department operates the Sonoma

COMPLAINT

3

1    Transfer Station, a recycling facility and transfer station in Sonoma, California.

2    IV.    **STATUTORY BACKGROUND**

3        11.    Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any

4    pollutant into waters of the United States, unless such discharge is in compliance with various

5    enumerated sections of the Act. Among other things, Section 301(a) prohibits discharges not

6    authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of

7    the Act, 33 U.S.C. § 1342.

8        12.    Section 402(p) of the Act establishes a framework for regulating municipal and

9    industrial storm water discharges under the NPDES program. 33 U.S.C. § 1342(p). States with

10   approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm

11   water discharges through individual permits issued to dischargers or through the issuance of a

12   single, statewide general permit applicable to all industrial storm water dischargers. 33 U.S.C. §

13   1342(p).

14       13.    Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of the U.S.

15   EPA has authorized California's State Board to issue NPDES permits including general NPDES

16   permits in California.

17       14.    The State Board elected to issue a statewide general permit for industrial storm water

18   discharges. The State Board issued the General Permit on or about November 19, 1991, modified

19   the General Permit on or about September 17, 1992, and reissued the General Permit on or about

20   April 17, 1997, pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p).

21       15.    In order to discharge storm water lawfully in California, industrial dischargers must

22   comply with the terms of the General Permit or have obtained and complied with an individual

23   NPDES permit. 33 U.S.C. § 1311(a).

24       16.    The General Permit contains several prohibitions. Effluent Limitation B(3) of the

25   General Permit requires dischargers to reduce or prevent pollutants in their storm water discharges

26   through implementation of the Best Available Technology Economically Achievable ("BAT") for

27   toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology

28   ("BCT") for conventional pollutants. BAT and BCT include both nonstructural and structural

COMPLAINT

1 measures. General Permit, Section A(8). Discharge Prohibition A(2) of the General Permit
2 prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to
3 cause pollution, contamination, or nuisance. Receiving Water Limitation C(1) of the General Permit
4 prohibits storm water discharges to any surface or ground water that adversely impact human health
5 or the environment. Receiving Water Limitation C(2) of the General Permit prohibits storm water
6 discharges that cause or contribute to an exceedance of any applicable water quality standards
7 contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

8       17.     The General Permit requires that facility operators "investigate the facility to identify
9 all non-storm water discharges and their sources. As part of this investigation, all drains (inlets and
10 outlets) shall be evaluated to identify whether they connect to the storm drain system. All non-storm
11 water discharges shall be described. This shall include the source, quantity, frequency, and
12 characteristics of the non-storm water discharges and associated drainage area." Section A(6)(a)(v).
13 The General Permit authorizes certain non-storm water discharges providing that the non-storm
14 water discharges are in compliance with Regional Board requirements; that the non-storm water
15 discharges are in compliance with local agency ordinances and/or requirements; that best
16 management practices are included in the Storm Water Pollution Prevention Plan to (1) prevent or
17 reduce the contact of non-storm water discharges with significant materials or equipment and (2)
18 minimize, to the extent practicable, the flow or volume of non-storm water discharges; that the non-
19 storm water discharges do not contain significant quantities of pollutants; and that the monitoring
20 program includes quarterly visual observations of each non-storm water discharge and its sources to
21 ensure that BMPs are being implemented and are effective (Special Conditions D). Section B(3) of
22 the General Permit requires dischargers to conduct visual observations of all drainage areas for the
23 presence of non-storm water discharges, to observe the non-storm water discharges, and maintain
24 records of such observations.

25       18.     In addition to absolute prohibitions, the General Permit contains a variety of
26 substantive and procedural requirements that dischargers must meet. Facilities discharging, or
27 having the potential to discharge, storm water associated with industrial activity that have not
28 obtained an individual NPDES permit must apply for coverage under the State's General Permit by

COMPLAINT

5

1  filing a Notice of Intent to Comply ("NOI"). The General Permit requires existing dischargers to
2  have filed their NOIs before March 30, 1992.

3      19.    Dischargers must develop and implement a Storm Water Pollution Prevention Plan
4  ("SWPPP"). The SWPPP must describe storm water control facilities and measures that comply
5  with the BAT and BCT standards. The General Permit requires that an initial SWPPP has been
6  developed and implemented before October 1, 1992. The SWPPP must, among other requirements,
7  identify and evaluate sources of pollutants associated with industrial activities that may affect the
8  quality of storm and non-storm water discharges from the facility and identify and implement site-
9  specific best management practices ("BMPs") to reduce or prevent pollutants associated with
10 industrial activities in storm water and authorized non-storm water discharges (Section A(2)). The
11 SWPPP's BMPs must implement BAT and BCT (Section B(3)). The SWPPP must include: a
12 description of individuals and their responsibilities for developing and implementing the SWPPP
13 (Section A(3)); a site map showing the facility boundaries, storm water drainage areas with flow
14 pattern and nearby water bodies, the location of the storm water collection, conveyance and
15 discharge system, structural control measures, impervious areas, areas of actual and potential
16 pollutant contact, and areas of industrial activity (Section A(4)); a list of significant materials
17 handled and stored at the site (Section A(5)); a description of potential pollutant sources including
18 industrial processes, material handling and storage areas, dust and particulate generating activities,
19 and a description of significant spills and leaks, a list of all non-storm water discharges and their
20 sources, and a description of locations where soil erosion may occur (Section A(6)). The SWPPP
21 must include an assessment of potential pollutant sources at the Facility and a description of the
22 BMPs to be implemented at the Facility that will reduce or prevent pollutants in storm water
23 discharges and authorized non-storm water discharges, including structural BMPs where non-
24 structural BMPs are not effective (Section A(7), (8)). The SWPPP must be evaluated to ensure
25 effectiveness and must be revised where necessary (Section A(9),(10)).

26     20.    Section C(3) of the General Permit requires a discharger to prepare and submit a
27 report to the Regional Board describing changes it will make to its current BMPs in order to prevent
28 or reduce any pollutant in its storm water discharges that is causing or contributing to an exceedance

COMPLAINT
                                                    6

1  of water quality standards. Once approved by the Regional Board, the additional BMPs must be

2  incorporated into the Facility's SWPPP. The report must be submitted to the Regional Board no

3  later than 60 days from the date the discharger first learns that its discharge is causing or

4  contributing to an exceedance of an applicable water quality standard. Section C(4)(a).

5       21.     Section C(11)(d) of the General Permit's Standard Provisions requires dischargers to

6  report any noncompliance to the Regional Board. *See also* Section E(6). Section A(9) of the

7  General Permit requires an annual evaluation of storm water controls including the preparation of an

8  evaluation report and implementation of any additional measures in the SWPPP to respond to the

9  monitoring results and other inspection activities.

10      22.     The General Permit requires dischargers commencing industrial activities before

11 October 1, 1992 to develop and implement an adequate written monitoring and reporting program no

12 later than October 1, 1992. Existing facilities covered under the General Permit must implement all

13 necessary revisions to their monitoring programs no later than August 1, 1997.

14      23.     As part of their monitoring program, dischargers must identify all storm water

15 discharge locations that produce a significant storm water discharge, evaluate the effectiveness of

16 BMPs in reducing pollutant loading, and evaluate whether pollution control measures set out in the

17 SWPPP are adequate and properly implemented. Dischargers must conduct visual observations of

18 these discharge locations for at least one storm per month during the wet season (October through

19 May) and record their findings in their Annual Report. Dischargers must also collect and analyze

20 storm water samples from at least two storms per year. Section B(5)(a) of the General Permit

21 requires that dischargers "shall collect storm water samples during the first hour of discharge from

22 (1) the first storm event of the wet season, and (2) at least one other storm event in the wet season.

23 All storm water discharge locations shall be sampled." Section B(5)(c)(i) requires dischargers to

24 sample and analyze during the wet season for basic parameters, such as pH, total suspended solids,

25 electrical conductance, and total organic content or oil & grease, as well as certain industry-specific

26 parameters. Section B(5)(c)(ii) requires dischargers to sample for toxic chemicals and other

27 pollutants likely to be in the storm water discharged from the facility. Section B(5)(c)(iii) requires

28 discharges to sample for parameters dependent on a facility's standard industrial classification

COMPLAINT

1   ("SIC") code. Dischargers must also conduct dry season visual observations to identify sources of
2   non-storm water pollution. Section B(7)(a) indicates that the visual observations and samples must
3   represent the "quality and quantity of the facility's storm water discharges from the storm event."
4   Section B(7)(c) requires that "if visual observation and sample collection locations are difficult to
5   observe or sample…facility operators shall identify and collect samples from other locations that
6   represent the quality and quantity of the facility's storm water discharges from the storm event."

7       24.     Section B(14) of the General Permit requires dischargers to submit an annual report
8   by July 1 of each year to the executive officer of the relevant Regional Board. The annual report
9   must be signed and certified by an appropriate corporate officer. Sections B(14), C(9), (10).
10  Section A(9)(d) of the General Permit requires the discharger to include in their annual report an
11  evaluation of their storm water controls, including certifying compliance with the General Permit.
12  *See also* Sections C(9), C(10) and B(14).

13      25.     The General Permit does not provide for any mixing zones by dischargers. The
14  General Permit does not provide for any dilution credits to be applied by dischargers.

15      26.     The Regional Board has established water quality standards for Sonoma Creek and its
16  its tributaries in the Water Quality Control Plan for the San Francisco Bay Basin, generally referred
17  to as the Basin Plan.

18      27.     The Basin Plan includes a narrative toxicity standard which states that "[a]ll waters
19  shall be maintained free of toxic substances in concentrations that are lethal or that produce other
20  detrimental responses in aquatic organisms."

21      28.     The Basin Plan provides that "[s]urface waters shall not contain concentrations of
22  chemical constituents in amounts that adversely affect any designated beneficial use."

23      29.     The Basin Plan provides that "[t]he suspended sediment load and suspended sediment
24  discharge rate of surface waters shall not be altered in such a manner as to cause nuisance or
25  adversely affect beneficial uses."

26      30.     The Basin Plan provides that "[w]aters shall be free of changes in turbidity that cause
27  nuisance or adversely affect beneficial uses."

28      31.     The Basin Plan provides that "[w]aters shall be free of coloration that causes

COMPLAINT

8

1  nuisance or adversely affects beneficial uses."

2  32.     The Basin Plan provides that "[w]aters shall not contain floating material, including

3  solids, liquids, foams, and scum, in concentrations that cause nuisance or adversely affect beneficial

4  uses."

5  33.     The Basin Plan includes a narrative oil and grease standard which states that

6  "[w]aters shall not contain oils, greases, waxes, or other materials in concentrations that result in a

7  visible film or coating on the surface of the water or on objects in the water, that cause nuisance, or

8  otherwise adversely affect beneficial uses."

9  34.     The Basin Plan provides that "[w]aters shall not contain suspended material in

10  concentrations that cause nuisance or adversely affect beneficial uses."

11  35.     The Basin Plan provides that "[t]he pH shall not be depressed below 6.5 nor raised

12  above 8.5."

13  36.     The Basin Plan indicates that Sonoma Creek and its tributaries are impaired by

14  pathogens, and that municipal runoff is one of the sources of pathogens.

15  37.     The Basin Plan also establishes a Total Maximum Daily Load for Sonoma Creek for

16  sediment of 117,400 tons/year.

17  38.     The Basin Plan establishes Freshwater Water Quality Objectives for zinc of 0.12

18  mg/L (4-day average and 1-hour average); for copper of 0.009 mg/L (4-day average) and 0.013

19  mg/L (1-hour average); and for lead of 0.0025 mg/L (4-day average) and 0.065 mg/L (1-hour

20  average).

21  39.     The EPA has adopted freshwater numeric water quality standards for zinc of 0.120

22  mg/L (Criteria Maximum Concentration – "CMC" and Criteria Continuous Concentration –

23  "CCC"); for copper of 0.009 mg/L (CCC) and 0.013 mg/L (CMC); and for lead of 0.065 mg/L

24  (CMC) and 0.0025 mg/L (CCC).

25  40.     EPA has established Parameter Benchmark Values as guidelines for determining

26  whether a facility discharging industrial storm water has implemented the requisite BAT and BCT.

27  65 Fed. Reg. 64746, 64767 (Oct. 30, 2000). EPA has established Parameter Benchmark Values for

28  the following parameters, among others: pH – 6.0-9.0 units; total suspended solids ("TSS") – 100

COMPLAINT

9

1 mg/L, oil and grease ("O&G") – 15 mg/L, total organic carbon ("TOC") – 110 mg/L, chemical
2 oxygen demand ("COD") – 120 mg/L, aluminum – 0.75 mg/L, zinc – 0.117 mg/L, iron – 1.0 mg/L,
3 copper – 0.0636 mg/L, magnesium – 0.0636 mg/L, and lead – 0.0816 mg/L.

4     41.     Section 505(a)(1) and Section 505(f) of the Act provide for citizen enforcement
5 actions against any "person," including individuals, corporations, or partnerships, for violations of
6 NPDES permit requirements. 33 U.S.C. §§1365(a)(1) and (f), § 1362(5). An action for injunctive
7 relief under the Act is authorized by 33 U.S.C. § 1365(a). Violators of the Act are also subject to an
8 assessment of civil penalties of up to \$32,500 per day per violation for all violations occurring
9 through January 12, 2009, and \$37,500 per day per violation for all violations occurring after January
10 12, 2009, pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365. *See also* 40
11 C.F.R. §§ 19.1 - 19.4.

12 **V.     STATEMENT OF FACTS**

13     42.     Defendant Sonoma operates the Sonoma Transfer Station, a facility located at 4376
14 Stage Gulch Road in Sonoma, California. On information and belief, CSPA alleges that the Facility
15 is engaged in the handling and transfer of municipal waste as well as recycling and storage of
16 various materials. The Facility falls within SIC Codes 5093 and 4212. The Facility covers
17 approximately 40 acres, the majority of which is paved and used for storing waste bins, recyclable
18 materials, and transporting and storing waste materials throughout the Facility. On information and
19 belief, Plaintiff alleges that there is at least one large building located on the property. Plaintiff is
20 informed and believes, and thereupon alleges that transfer, recycling and the movement of materials
21 is conducted both inside and outside of this building. Waste and containers are transported in and
22 out of these buildings for storage in the outdoor areas of the Facility.

23     43.     Defendant channels and collects storm water falling on the Facility through a series
24 of storm water drains that lead to at least two storm water outfalls. Each storm drain collects storm
25 water runoff from a particular area of the Facility. The Facility's outfalls discharge into channels
26 that flow into Champlin Creek. Champlin Creek flows into Sonoma Creek, which flows into San
27 Pablo Bay.

28     44.     On information and belief, Plaintiff alleges that the industrial activities at the site

COMPLAINT
10

**1** include the sorting and processing of solid waste, including refuse, yard debris, appliances,

**2** electronics, and tires. It also includes the storage and maintenance of trucks, tractors, and other

**3** machinery used to transfer and dispose of these materials.

**4**     45.     Significant activities at the site take place outside and are exposed to rainfall. These

**5** activities include transfer, storage, and disposal of the numerous types of materials handled by the

**6** Facility; the storage, maintenance, and use of vehicles and equipment for materials handling; and the

**7** storage, handling, and disposal of waste materials. Loading and delivery of materials occurs

**8** outside. Trucks enter and exit the Facility directly from and to a public road. Trucks, forklifts, and

**9** other machinery are the primary means of moving materials around the Facility. These areas are

**10** exposed to storm water and storm flows due to the lack of overhead coverage, berms, and other

**11** storm water controls.

**12**     46.     Industrial machinery, heavy equipment and vehicles, including trucks and fork lifts

**13** are operated and stored at the Facility in areas exposed to storm water flows. Plaintiff is informed

**14** and believes, and thereupon alleges, that such machinery and equipment leak contaminants such as

**15** oil, grease, diesel fuel, anti-freeze and hydraulic fluids that are exposed to storm water flows, and

**16** that such machinery and equipment track sediment and other contaminants throughout the Facility.

**17** On information and belief, Plaintiff alleges that trucks leaving the Facility track substantial amounts

**18** of material onto adjoining public roads. During rain events, material that has been tracked from the

**19** Facility onto public roads during dry weather is transported via storm water to storm drain channels.

**20**     47.     Plaintiff is informed and believes, and thereupon alleges that the storm water flows

**21** easily over the surface of the Facility, collecting suspended sediment, dirt, oils, grease, and other

**22** pollutants as it flows toward the storm water drains. Storm water and any pollutants contained in

**23** that storm water entering the drains flows directly to the Facility's outfalls which discharge into

**24** channels that flow into Champlin Creek. Champlin Creek flows into Sonoma Creek, which flows

**25** into San Pablo Bay.

**26**     48.     The management practices at the Facility are wholly inadequate to prevent the

**27** sources of contamination described above from causing the discharge of pollutants to waters of the

**28** United States. The Facility lacks sufficient structural controls such as grading, berming, roofing,

COMPLAINT

11

1 containment, or drainage structures to prevent rainfall and storm water flows from coming into

2 contact with these and other exposed sources of contaminants. The Facility lacks sufficient

3 structural controls to prevent the discharge of water once contaminated. The Facility lacks adequate

4 storm water pollution treatment technologies to treat storm water once contaminated. The Facility

5 lacks controls to prevent the tracking and flow of pollutants onto adjacent public roads.

6      49.     Since at least January 3, 2008, Defendant has taken samples or arranged for samples

7 to be taken of storm water discharges at the Facility. The sample results were reported in the

8 Facility's annual reports submitted to the Regional Board. Defendant Sonoma certified each of

9 those annual reports pursuant to Sections A and C of the General Permit.

10      50.     Since at least January 3, 2008, the Facility has detected total suspended solids, zinc,

11 aluminum, iron, magnesium, and chemical oxygen demand in storm water discharged from the

12 Facility. Since at least November 3, 2008, the Facility has detected lead in storm water discharged

13 from the Facility. Since at least October 13, 2009, the Facility has detected oil & grease in storm

14 water discharged from the Facility. Since at least October 22, 2010, the Facility has detected total

15 organic carbon in storm water discharged from the Facility. Levels of these pollutants detected in

16 the Facility's storm water have been in excess of EPA's numeric parameter benchmark values.

17 Levels of these pollutants detected in the Facility's storm water have been in excess of water quality

18 standards established in the Basin Plan.

19      51.     The following discharges on the following dates contained concentrations of

20 pollutants in excess of numeric water quality standards and in violation of narrative water quality

21 standards established in the Basin Plan and/or EPA's regulations:

| Date | Parameter | Observed Concentration | Basin Plan Water Quality Objective | Location (as identified by the Facility) |
|---|---|---|---|---|
| 1/19/2012 | Zinc | 0.63 mg/L | 0.12 mg/L (1-hour average and 4-day average) | SW-4 |
| 10/3/2011 | Zinc | 0.74 mg/L | 0.12 mg/L (1-hour average and 4-day average) | SW-4 |
| 10/3/2011 | Zinc | 0.2 mg/L | 0.12 mg/L (1-hour average and 4-day | SW-3 |

| | | | average) | |
|---|---|---|---|---|
| 1/3/2011 | Zinc | 0.15 mg/L | 0.12 mg/L (1-hour average and 4-day average) | SW-4 |
| 10/22/2010 | Zinc | 0.65 mg/L | 0.12 mg/L (1-hour average and 4-day average) | SW-4 |
| 1/12/2010 | Zinc | 0.23 mg/L | 0.12 mg/L (1-hour average and 4-day average) | SW-3 |
| 10/13/2009 | Zinc | 0.22 mg/L | 0.12 mg/L (1-hour average and 4-day average) | SW-4 |
| 10/13/2009 | Zinc | 0.13 mg/L | 0.12 mg/L (1-hour average and 4-day average) | SW-3 |
| 11/3/2008 | Zinc | 0.21 mg/L | 0.12 mg/L (1-hour average and 4-day average) | SW-4 |
| 1/3/2008 | Zinc | 0.48 mg/L | 0.12 mg/L (1-hour average and 4-day average) | SW-4 |
| 1/3/2008 | Zinc | 0.42 mg/L | 0.12 mg/L (1-hour average and 4-day average) | SW-3 |
| 1/19/2012 | Lead | 0.11 mg/L | 0.0025 mg/L (4-day average) | SW-4 |
| 1/19/2012 | Lead | 0.11 mg/L | 0.065 mg/L (1-hour average) | SW-4 |
| 10/3/2011 | Lead | 0.13 mg/L | 0.0025 mg/L (4-day average) | SW-4 |
| 10/3/2011 | Lead | 0.13 mg/L | 0.065 mg/L (1-hour average) | SW-4 |
| 10/3/2011 | Lead | 0.03 mg/L | 0.0025 mg/L (4-day average) | SW-3 |
| 1/13/2011 | Lead | 0.01 mg/L | 0.0025 mg/L (4-day average) | SW-4 |
| 1/13/2011 | Lead | 0.01 mg/L | 0.065 mg/L (1-hour average) | SW-3 |
| 10/22/2010 | Lead | 0.14 mg/L | 0.0025 mg/L (4-day average) | SW-4 |
| 10/22/2010 | Lead | 0.14 mg/L | 0.065 mg/L (1-hour average) | SW-4 |
| 10/22/2010 | Lead | 0.0069 mg/L | 0.0025 mg/L (4-day average) | SW-3 |
| 1/12/2010 | Lead | 0.0072 mg/L | 0.0025 mg/L (4-day | SW-4 |

| | | | average) | |
|---|---|---|---|---|
| 10/13/2009 | Lead | 0.018 mg/L | 0.0025 mg/L (4-day average) | SW-4 |
| 10/13/2009 | Lead | 0.032 mg/L | 0.0025 mg/L (4-day average) | SW-3 |
| 2/13/2009 | Lead | 0.0049 mg/L | 0.0025 mg/L (4-day average) | SW-4 |
| 2/13/2009 | Lead | 0.0032 mg/L | 0.0025 mg/L (4-day average) | SW-3 |
| 11/3/2008 | Lead | 0.031 mg/L | 0.0025 mg/L (4-day average) | SW-4 |
| 11/3/2008 | Lead | 0.24 mg/L | 0.0025 mg/L (4-day average) | SW-3 |
| 11/3/2008 | Lead | 0.24 mg/L | 0.065 mg/L (1-hour average) | SW-3 |
| 1/3/2008 | Lead | 0.078 mg/L | 0.0025 mg/L (4-day average) | SW-4 |
| 1/3/2008 | Lead | 0.078 mg/L | 0.065 mg/L (1-hour average) | SW-4 |
| 1/3/2008 | Lead | 0.081 mg/L | 0.0025 mg/L (4-day average) | SW-3 |
| 1/3/2008 | Lead | 0.081 mg/L | 0.065 mg/L (1-hour average) | SW-3 |
| 1/19/2012 | Copper | 0.12 mg/L | 0.013 mg/L (1-hour average) | SW-4 |
| 1/19/2012 | Copper | 0.12 mg/L | 0.009 mg/L (4-day average) | SW-4 |
| 10/3/2011 | Copper | 0.15 mg/L | 0.013 mg/L (1-hour average) | SW-4 |
| 10/3/2011 | Copper | 0.15 mg/L | 0.009 mg/L (4-day average) | SW-4 |
| 10/3/2011 | Copper | 0.069 mg/L | 0.013 mg/L (1-hour average) | SW-3 |
| 10/3/2011 | Copper | 0.069 mg/L | 0.009 mg/L (4-day average) | SW-3 |
| 1/13/2011 | Copper | 0.02 mg/L | 0.013 mg/L (1-hour average) | SW-4 |
| 1/13/2011 | Copper | 0.02 mg/L | 0.009 mg/L (4-day average) | SW-4 |
| 10/22/2010 | Copper | 0.1 mg/L | 0.013 mg/L (1-hour average) | SW-4 |
| 10/22/2010 | Copper | 0.1 mg/L | 0.009 mg/L (4-day average) | SW-4 |
| 10/22/2010 | Copper | 0.063 mg/L | 0.013 mg/L (1-hour average) | SW-3 |

COMPLAINT

14

| 10/22/2010 | Copper | 0.063 mg/L | 0.009 mg/L (4-day average) | SW-3 |
|---|---|---|---|---|
| 1/12/2010 | Copper | 0.017 mg/L | 0.013 mg/L (1-hour average) | SW-4 |
| 1/12/2010 | Copper | 0.017 mg/L | 0.009 mg/L (4-day average) | SW-4 |
| 1/12/2010 | Copper | 0.015 mg/L | 0.013 mg/L (1-hour average) | SW-3 |
| 1/12/2010 | Copper | 0.015 mg/L | 0.009 mg/L (4-day average) | SW-3 |
| 10/13/2009 | Copper | 0.08 mg/L | 0.013 mg/L (1-hour average) | SW-4 |
| 10/13/2009 | Copper | 0.08 mg/L | 0.009 mg/L (4-day average) | SW-4 |
| 10/13/2009 | Copper | 0.029 mg/L | 0.013 mg/L (1-hour average) | SW-3 |
| 10/13/2009 | Copper | 0.029 mg/L | 0.009 mg/L (4-day average) | SW-3 |
| 1/3/2008 | Copper | 0.07 mg/L | 0.013 mg/L (1-hour average) | SW-4 |
| 1/3/2008 | Copper | 0.07 mg/L | 0.009 mg/L (4-day average) | SW-4 |
| 1/3/2008 | Copper | 0.077 mg/L | 0.013 mg/L (1-hour average) | SW-3 |
| 1/3/2008 | Copper | 0.077 mg/L | 0.009 mg/L (4-day average) | SW-3 |
| 5/3/2012 | Narrative | Low turbidity/Gray-brown color | Basin Plan 3.3.19 / Basin Plan 3.3.4 | SW-3 |
| 5/3/2012 | Narrative | Low turbidity/Gray-brown color | Basin Plan 3.3.19 / Basin Plan 3.3.4 | SW-4 |
| 4/10/2012 | Narrative | Moderate turbidity/Gray-brown color | Basin Plan 3.3.19 / Basin Plan 3.3.4 | SW-3 |
| 4/10/2012 | Narrative | Moderate turbidity/Gray-brown color | Basin Plan 3.3.19 / Basin Plan 3.3.4 | SW-4 |
| 3/13/2012 | Narrative | Low turbidity/Brown color | Basin Plan 3.3.19 / Basin Plan 3.3.4 | SW-3 |
| 3/13/2012 | Narrative | Low turbidity/Gray-brown color | Basin Plan 3.3.19 / Basin Plan 3.3.4 | SW-4 |
| 1/19/2012 | Narrative | Low Turbidity/Gray- | Basin Plan 3.3.19 / Basin Plan 3.3.4 | SW-3 |

COMPLAINT

| | | Brown Color | | |
|---|---|---|---|---|
| 1/19/2012 | Narrative | Low Turbidity/Gray-Brown Color | Basin Plan 3.3.19 / Basin Plan 3.3.4 | SW-4 |
| 5/25/2011 | Narrative | Heavy turbidity/Dark brown color | Basin Plan 3.3.19 / Basin Plan 3.3.4 | SW-3 |
| 5/25/2011 | Narrative | Moderate turbidity/Gray-brown color | Basin Plan 3.3.19 / Basin Plan 3.3.4 | SW-4 |
| 4/13/2011 | Narrative | Light turbidity/Gray color | Basin Plan 3.3.19 / Basin Plan 3.3.4 | SW-3 |
| 2/14/2011 | Narrative | Low turbidity/brown color | Basin Plan 3.3.19 / Basin Plan 3.3.4 | SW-3 |
| 1/13/2011 | Narrative | Minor turbidity/Brown color | Basin Plan 3.3.19 / Basin Plan 3.3.4 | SW-3 |
| 1/13/2011 | Narrative | Minor turbidity/Brown color | Basin Plan 3.3.19 / Basin Plan 3.3.4 | SW-4 |
| 10/28/2010 | Narrative | High turbidity/Gray color | Basin Plan 3.3.19 / Basin Plan 3.3.4 | SW-3 |
| 10/28/2010 | Narrative | High turbidity/Gray color | Basin Plan 3.3.19 / Basin Plan 3.3.4 | SW-3 |
| 10/28/2010 | Narrative | High turbidity/Gray color | Basin Plan 3.3.19 / Basin Plan 3.3.4 | SW-4 |

52.    The levels of zinc in storm water detected by the Facility have exceeded the Freshwater Water Quality Objective of 0.12 mg/L (4-day average and 1-hour average) established by the Basin Plan. 0.12 mg/L is the same level as the Criteria Continuous Concentration ('CCC") and the Criteria Maximum Concentration ("CMC") which is the freshwater numeric water quality standard established for zinc by the EPA. For example, on October 3, 2011, the level of zinc measured in the Facility's discharged storm water was 0.74 mg/L. That level of zinc is over six times both the 4-day and the 1-hour average water quality standard for zinc established by the Basin Plan and the CMC/CCC established by the EPA.

COMPLAINT

16

1      53.    The levels of zinc in storm water detected by the Facility have exceeded the

2  benchmark value for zinc of 0.117 mg/L established by EPA. For example, on October 3, 2011, the

3  level of zinc measured by Defendant in the Facility's discharged storm water was 0.74 mg/L. That

4  level of zinc is over six times the benchmark value for zinc established by EPA. The Facility also

5  has measured levels of zinc in storm water discharged from the Facility in excess of EPA's

6  benchmark value of 0.117 mg/L on January 3, 2008; November 3, 2008; February 13, 2009; October

7  13, 2009; January 12, 2010; October 22, 2010; January 13, 2011; and January 19, 2012.

8      54.    The levels of lead in storm water detected by the Facility have exceeded the

9  Freshwater Water Quality Objective of 0.0025 mg/L (4-day average) established by the Basin Plan.

10  0.0025 mg/L is the same level as the CCC for lead, which is the freshwater numeric water quality

11  standard established for lead by the EPA. For example, on October 3, 2011, the level of lead

12  measured in the Facility's discharged storm water was 0.13 mg/L. That level of lead is 52 times

13  both the 4-day average water quality standard for lead established by the Basin Plan and the CCC

14  established by the EPA.

15      55.    The levels of lead in storm water detected by the Facility have exceeded the

16  Freshwater Water Quality Objective of 0.065 mg/L (1-hour average) established by the Basin Plan.

17  0.065 mg/L is the same level as the CMC for lead, which is the freshwater numeric water quality

18  standard established for lead by the EPA. For example, on October 3, 2011, the level of lead

19  measured in the Facility's discharged storm water was 0.13 mg/L. That level of lead is twice both

20  the 1-hour average water quality standard for lead established by the Basin Plan and the CMC

21  established by the EPA.

22      56.    The levels of lead in storm water detected by the Facility have exceeded the

23  benchmark value for lead of 0.0816 mg/L established by EPA. For example, on October 3, 2011,

24  the level of lead measured by Defendant in the Facility's discharged storm water was 0.13 mg/L.

25  ·That level of lead is over one and a half times the benchmark value for lead established by EPA.

26  The Facility also has measured levels of lead in storm water discharged from the Facility in excess

27  of EPA's benchmark value of 0.0816 mg/L on November 3, 2008; October 22, 2010; and January

28  19, 2012.

COMPLAINT

57.     The levels of copper in storm water detected by the Facility have exceeded the Freshwater Water Quality Objective of 0.009 mg/L (4-day average) established by the Basin Plan. 0.009 mg/L is the same level as the CCC for copper, which is the freshwater numeric water quality standard established for copper by the EPA. For example, on October 3, 2011, the level of copper measured in the Facility's discharged storm water was 0.15 mg/L. That level of copper is almost seventeen times the 4-day average water quality standard for copper established by the Basin Plan.

58.     The levels of copper in storm water detected by the Facility have exceeded the Freshwater Water Quality Objective of 0.013 mg/L (1-hour average) established by the Basin Plan. 0.013 mg/L is the same level as the CMC for copper, which is the freshwater numeric water quality standard established for copper by the EPA. For example, on October 3, 2011, the level of copper measured in the Facility's discharged storm water was 0.15 mg/L. That level of copper is over eleven and a half times the 1-hour average water quality standard for copper established by the Basin Plan.

59.     The levels of copper in storm water detected by the Facility have exceeded the benchmark value for copper of 0.0636 mg/L established by EPA. For example, on October 3, 2011, the level of copper measured by Defendant in the Facility's discharged storm water was 0.13 mg/L. That level of copper is over twice times the benchmark value for copper established by EPA. The Facility also has measured levels of copper in storm water discharged from the Facility in excess of EPA's benchmark value of 0.0636 mg/L on January 3, 2008; October 13, 2009; October 22, 2010; and January 19, 2012.

60.     The level of total suspended solids in storm water detected by the Facility has exceeded the benchmark value for total suspended solids of 100 mg/L established by EPA. For example, on January 19, 2012, the level of total suspended solids measured by Defendant in the Facility's discharged storm water was 1200 mg/L. That level of total suspended solids is twelve times the benchmark value for total suspended solids established by EPA. The Facility also has measured levels of total suspended solids in storm water discharged from the Facility in excess of EPA's benchmark value of 100 mg/L on January 3, 2008; November 3, 2008; October 13, 2009; October 22, 2010; and October 3, 2011.

COMPLAINT

18

61.     The level of total organic carbon in storm water detected by the Facility has exceeded the benchmark value for total organic carbon of 110 mg/L established by EPA. For example, on October 3, 2011, the level of total organic carbon measured by Defendant in the Facility's discharged storm water was 213 mg/L. That level of total organic carbon is almost twice the benchmark value for total organic carbon established by EPA. The Facility also has measured levels of total organic carbon in storm water discharged from the Facility in excess of EPA's benchmark value of 110 mg/L on October 22, 2010, and January 19, 2012.

62.     The level of oil & grease in storm water detected by the Facility has exceeded the benchmark value for oil & grease of 15 mg/L established by EPA. For example, on October 3, 2011, the level of oil & grease measured by Defendant in the Facility's discharged storm water was 33 mg/L. That level of oil & grease is over twice the benchmark value for oil & grease established by EPA. The Facility also has measured levels of oil & grease in storm water discharged from the Facility in excess of EPA's benchmark value of 110 mg/L on October 13, 2009.

63.     The levels of aluminum in storm water detected by the Facility have exceeded the benchmark value for aluminum of 0.75 mg/L established by EPA. For example, on January 19, 2012, the level of aluminum measured by Defendant in the Facility's discharged storm water was 9.9 mg/L. That level of aluminum is over thirteen times the benchmark value for aluminum established by EPA. The Facility also has measured levels of aluminum in storm water discharged from the Facility in excess of EPA's benchmark value of 0.75 mg/L in nearly every other storm water sample it has taken for the past five years, including January 3, 2008; November 3, 2008; February 13, 2009; October 13, 2009; January 12, 2010; October 22, 2010; January 13, 2011; and October 3, 2011.

64.     The levels of iron in storm water detected by the Facility have exceeded the benchmark value for iron of 1.0 mg/L established by EPA. For example, on January 19, 2012, the level of iron measured by Defendant in the Facility's discharged storm water was 13 mg/L. That level of iron is thirteen times the benchmark value for iron established by EPA. The Facility also has measured levels of iron in storm water discharged from the Facility in excess of EPA's benchmark value of 1.0 mg/L in nearly every other storm water sample it has taken for the past five

COMPLAINT
19

1  years, including January 3, 2008; November 3, 2008; February 13, 2009; October 13, 2009; January

2  12, 2010; October 22, 2010; January 13, 2011; and October 3, 2011.

3       65.    The levels of magnesium in storm water detected by the Facility have exceeded the

4  benchmark value for magnesium of 0.0636 mg/L established by EPA. For example, on January 19,

5  2012, the level of magnesium measured by Defendant in the Facility's discharged storm water was

6  50 mg/L. That level of magnesium is over 786 times the benchmark value for magnesium

7  established by EPA. The Facility also has measured levels of magnesium in storm water discharged

8  from the Facility in excess of EPA's benchmark value of 0.0636 mg/L on January 3, 2008; October

9  13, 2009; January 12, 2010; October 22, 2010; January 13, 2011; and October 3, 2011.

10       66.    The levels of chemical oxygen demand in storm water detected by the Facility have

11  exceeded the benchmark value for chemical oxygen demand of 120 mg/L established by EPA. For

12  example, on October 3, 2011, the level of chemical oxygen demand measured by Defendant in the

13  Facility's discharged storm water was 820 mg/L. That level of chemical oxygen demand is almost

14  seven times the benchmark value for chemical oxygen demand established by EPA. The Facility

15  also has measured levels of chemical oxygen demand in storm water discharged from the Facility in

16  excess of EPA's benchmark value of 120 mg/L on January 3, 2008; October 13, 2009; October 22,

17  2010; and January 19, 2012.

18       67.    On information and belief, Plaintiff alleges that since at least November 26, 2007,

19  Defendant has failed to implement BAT and BCT at the Facility for its discharges of suspended

20  solids, chemical oxygen demand, total organic carbon, oil & grease, aluminum, zinc, lead, iron,

21  copper, magnesium, and other pollutants. Section B(3) of the General Permit requires that

22  Defendant implement BAT for toxic and nonconventional pollutants and BCT for conventional

23  pollutants by no later than October 1, 1992. As of the date of this Complaint, Defendant has failed

24  to implement BAT and BCT.

25       68.    On information and belief, Plaintiff alleges that since at least November 26, 2007,

26  Defendant has failed to implement an adequate Storm Water Pollution Prevention Plan for the

27  Facility. Plaintiff is informed and believes, and thereupon alleges, that the SWPPP prepared for the

28  Facility does not set forth site-specific best management practices for the Facility that are consistent

COMPLAINT

20

1 with BAT or BCT for the Facility. Plaintiff is informed and believes, and thereupon alleges, that the
2 SWPPP prepared for the Facility does not include an adequate assessment of potential pollutant
3 sources, structural pollutant control measures employed by the Defendant, a list of actual and
4 potential areas of pollutant contact, or an adequate description of best management practices to be
5 implemented at the Facility to reduce pollutant discharges. According to information available to
6 CSPA, Defendant's SWPPP has not been evaluated to ensure its effectiveness and revised where
7 necessary to further reduce pollutant discharges. Plaintiff is informed and believes, and thereupon
8 alleges, that the SWPPP does not include each of the mandatory elements required by Section A of
9 the General Permit.

10    69.    Information available to CSPA indicates that as a result of these practices, storm
11 water containing excessive pollutants is being discharged during rain events from the Facility
12 directly to channels that flow into Champlin Creek, which flows into Sonoma Creek, and then flows
13 into San Pablo Bay.

14    70.    On information and belief, Plaintiff alleges that Defendant failed to conduct monthly
15 visual observations of storm water discharges during the 2007-2008, 2008-2009, and 2009-2010 wet
16 seasons.

17    71.    On information and belief, Plaintiff alleges that Defendant failed to sample storm
18 water from all of the Facility's discharge locations during the 2007-2008. 2008-2009, 2009-2010,
19 2010-2011, and 2011-2012 wet seasons.

20    72.    Plaintiff is informed and believes, and thereupon alleges, that, Defendant has failed
21 and continues to fail to alter the Facility's SWPPP and site-specific BMPs consistent with Section
22 A(9) of the General Permit.

23    73.    Plaintiff is informed and believes that Defendant failed to submit to the Regional
24 Board a true and complete annual report certifying compliance with the General Permit since at least
25 July 1, 2006. Pursuant to Sections A(9)(d), B(14), and C(9), (10) of the General Permit, Defendant
26 must submit an annual report, that is signed and certified by the appropriate corporate officer,
27 outlining the Facility's storm water controls and certifying compliance with the General Permit.
28 Plaintiff is informed and believes, and thereupon alleges, that Defendant has signed incomplete

COMPLAINT                                        21

1  annual reports that purported to comply with the General Permit when there was significant
2  noncompliance at the Facility.

3      74.    Information available to Plaintiff indicates that Defendant has not fulfilled the
4  requirements set forth in the General Permit for discharges from the Facility due to the continued
5  discharge of contaminated storm water. Plaintiff is informed and believes, and thereupon alleges, that
6  all of the violations alleged in this Complaint are ongoing and continuing.

7  VI.    **CLAIMS FOR RELIEF**

8                                    **FIRST CAUSE OF ACTION**
9                            **Failure to Implement the Best Available and**
                             **Best Conventional Treatment Technologies**
10                    **(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

11     75.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set
    forth herein.
12
       76.    The General Permit's SWPPP requirements and Effluent Limitation B(3) require
13
    dischargers to reduce or prevent pollutants in their storm water discharges through implementation
14
    of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants. Defendant
15
    has failed to implement BAT and BCT at the Facility for its discharges of suspended solids,
16
    chemical oxygen demand, total organic carbon, oil & grease, aluminum, zinc, lead, iron, copper,
17
    magnesium, and other un-monitored pollutants in violation of Effluent Limitation B(3) of the
18
    General Permit.
19
       77.    Each day since November 26, 2007, that Defendant has failed to develop and
20
    implement BAT and BCT in violation of the General Permit is a separate and distinct violation of the
21
    General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).
22
       78.    Defendant has been in violation of the BAT/BCT requirements every day since
23
    November 26, 2007. Defendant continues to be in violation of the BAT/BCT requirements each day
24
    that it fails to develop and fully implement BAT/BCT at the Facility.
25
                                    **SECOND CAUSE OF ACTION**
26                            **Discharges of Contaminated Storm Water**
                             **in Violation of Permit Conditions and the Act**
27                           **(Violations of 33 U.S.C. §§ 1311, 1342)**

28     79.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set

COMPLAINT                                           22

1 forth herein.

2     80.    Discharge Prohibition A(2) of the General Permit requires that storm water discharges
3 and authorized non-storm water discharges shall not cause or threaten to cause pollution,
4 contamination, or nuisance.  Receiving Water Limitations C(1) and C(2) of the General Permit require
5 that storm water discharges and authorized non-storm water discharges shall not adversely impact
6 human health or the environment, and shall not cause or contribute to a violation of any water quality
7 standards contained in a Statewide Water Quality Control Plan or the applicable Regional Board's
8 Basin Plan.

9     81.    Plaintiff is informed and believes, and thereupon alleges, that since at least November
10 26, 2007, Defendant has been discharging polluted storm water from the Facility in excess of
11 applicable water quality standards in violation of the Discharge Prohibition A(2) of the General
12 Permit.

13     82.    During every rain event, storm water flows freely over exposed materials, waste
14 products, and other accumulated pollutants at the Facility, becoming contaminated with suspended
15 solids, chemical oxygen demand, total organic carbon, oil & grease, aluminum, zinc, lead, iron,
16 copper, magnesium, and, on information and belief, other un-monitored pollutants, at levels above
17 applicable water quality standards.  The storm water then flows untreated from the Facility into
18 municipal drain part of the City of San Jose storm drain system, which then flows into the Creek and
19 then the Bay.

20     83.    Plaintiff is informed and believes, and thereupon alleges, that these discharges of
21 contaminated storm water are causing or contributing to the violation of the applicable water quality
22 standards in a Statewide Water Quality Control Plan and/or the applicable Regional Board's Basin
23 Plan in violation of Receiving Water Limitation C(2) of the General Permit.

24     84.    Plaintiff is informed and believes, and thereupon alleges, that these discharges of
25 contaminated storm water are adversely affecting human health and the environment in violation of
26 Receiving Water Limitation C(1) of the General Permit.

27     85.    Every day since at least November 26, 2007, that Defendant has discharged and
28 continues to discharge polluted storm water from the Facility in violation of the General Permit is a

COMPLAINT
23

1  separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a). These violations are
2  ongoing and continuous.

### THIRD CAUSE OF ACTION
**Failure to Prepare, Implement, Review, and Update**
**an Adequate Storm Water Pollution Prevention Plan**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

86.     Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set
forth herein.

87.     Section A and Provision E of the General Permit requires dischargers of storm water
associated with industrial activity to develop and implement an adequate SWPPP no later than
October 1, 1992.

88.     Defendant has failed to develop and implement an adequate SWPPP for the Facility.
Defendant's ongoing failure to develop and implement an adequate SWPPP for the Facility is
evidenced by, *inter alia*, Defendant's outdoor storage of various materials without appropriate best
management practices; the continued exposure of significant quantities of various materials to storm
water flows; the continued exposure and tracking of waste resulting from the operation or maintenance
of vehicles at the site, including trucks and forklifts; the failure to either treat storm water prior to
discharge or to implement effective containment practices; and the continued discharge of storm
water pollutants from the Facility at levels in excess of EPA benchmark values and Basin Plan water
quality standards.

89.     Defendant has failed to adequately update the Facility's SWPPP in response to the
analytical results of the Facility's storm water monitoring.

90.     Each day since November 26, 2007, that Defendant has failed to develop, implement
and update an adequate SWPPP for the Facility is a separate and distinct violation of the General
Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

91.     Defendant has been in violation of the SWPPP requirements every day since November
26, 2007. Defendant continues to be in violation of the SWPPP requirements each day that it fails to
develop and fully implement an adequate SWPPP for the Facility.

///

COMPLAINT

**FOURTH CAUSE OF ACTION**
**Failure to Develop and Implement an Adequate Monitoring and Reporting Program**
**(Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

92.     Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

93.     Section B of the General Permit requires dischargers of storm water associated with industrial activity to have developed and be implementing a monitoring and reporting program (including, *inter alia*, sampling and analysis of discharges) no later than October 1, 1992.

94.     Defendant has failed to develop and implement an adequate monitoring and reporting program for the Facility. Defendant's ongoing failure to develop and implement an adequate monitoring and reporting program are evidenced by, *inter alia*, its failure to conduct all of the required wet weather inspections of the Facility.

95.     Each day since November 26, 2007, that Defendant has failed to develop and implement an adequate monitoring and reporting program for the Facility in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a). The absence of requisite monitoring and analytical results are ongoing and continuous violations of the Act.

**FIFTH CAUSE OF ACTION**
**False Certification of Compliance in Annual Report**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

96.     Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

97.     Defendant has falsely certified compliance with the General Permit in each of the annual reports submitted to the Regional Board since at least June 20, 2011.

98.     Each day since at least June 20, 2011 that Defendant has falsely certified compliance with the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a). Defendant continues to be in violation of the General Permit's certification requirement each day that it maintains its false certification of its compliance with the General Permit.

///

COMPLAINT

25

1  **VII.    RELIEF REQUESTED**

2          Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

3                  a.   Declare Defendant to have violated and to be in violation of the Act as alleged

4  herein;

5                  b.   Enjoin Defendant from discharging polluted storm water from the Facility unless

6  authorized by the Permit;

7                  c.   Enjoin Defendant from further violating the substantive and procedural

8  requirements of the Permit;

9                  d.   Order Defendant to immediately implement storm water pollution control and

10  treatment technologies and measures that are equivalent to BAT or BCT and prevent pollutants in the

11  Facility's storm water from contributing to violations of any water quality standards;

12                  e.   Order Defendant to comply with the Permit's monitoring and reporting

13  requirements, including ordering supplemental monitoring to compensate for past monitoring

14  violations;

15                  f.   Order Defendant to prepare a SWPPP consistent with the Permit's requirements and

16  implement procedures to regularly review and update the SWPPP;

17                  g.   Order Defendant to provide Plaintiff with reports documenting the quality and

18  quantity of their discharges to waters of the United States and their efforts to comply with the Act and

19  the Court's orders;

20                  h.   Order Defendant to pay civil penalties of $32,500 per day per violation for all

21  violations occurring through January 12, 2009, and $37,500 per day per violation for all violations

22  occurring after January 12, 2009, for each violation of the Act pursuant to Sections 309(d) and 505(a)

23  of the Act, 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1 - 19.4;

24                  i.   Order Defendant to take appropriate actions to restore the quality of waters

25  impaired or adversely affected by their activities;

26                  j.   Award Plaintiff's costs (including reasonable investigative, attorney, witness,

27  compliance oversight, and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and,

28  ///

COMPLAINT

1    k.   Award any such other and further relief as this Court may deem appropriate.

2    Dated: January 25, 2013                Respectfully submitted,

3                                            LOZEAU DRURY LLP

4                                            By:   _____

5                                            Douglas J. Chermak
                                             Attorneys for Plaintiff
6                                            CALIFORNIA SPORTFISHING PROTECTION
                                             ALLIANCE
7

COMPLAINT

27

# EXHIBIT A

 LOZEAU **DRURY**LLP

T 510.836.4200  F 510.836.4205 | 410 12th Street, Suite 250  Oakland, Ca 94607 | www.lozeaudrury.com  michael@lozeaudrury.com

## VIA CERTIFIED MAIL
## RETURN RECEIPT REQUESTED

November 9, 2012

| | |
|---|---|
| Phillip Demery – Director<br>County of Sonoma – Transportation and Public<br>Works Department<br>2300 County Center Dr. Ste B100<br>Santa Rosa, CA 95407 | 3rd District Supervisor Shirlee Zane<br>County of Sonoma Board of Supervisors<br>575 Administration Drive, Room 100A<br>Santa Rosa, CA 95403 |
| Susan Klassen – Deputy Director, Airport,<br>Transit, Refuse<br>County of Sonoma – Transportation and Public<br>Works Department<br>2300 County Center Dr. Ste B100<br>Santa Rosa, CA 95407 | 4th District Supervisor Mike McGuire<br>County of Sonoma Board of Supervisors<br>575 Administration Drive, Room 100A<br>Santa Rosa, CA 95403 |
| 1st District Supervisor Valerie Brown<br>County of Sonoma Board of Supervisors<br>575 Administration Drive, Room 100A<br>Santa Rosa, CA 95403 | 5th District Supervisor Efren Carrillo<br>County of Sonoma Board of Supervisors<br>575 Administration Drive, Room 100A<br>Santa Rosa, CA 95403 |
| 2nd District Supervisor David Rabbitt<br>County of Sonoma Board of Supervisors<br>575 Administration Drive, Room 100A<br>Santa Rosa, CA 95403 | Trish Pisenti, Operations Manager<br>Sonoma Transfer Station<br>4376 Stage Gulch Road<br>Sonoma, CA 95476 |

## Re:  Notice of Violations and Intent to File Suit Under the Federal Water Pollution Control Act

Dear Messrs Demery, Rabbitt, McGuire, and Carrillo; and Mmes Klassen, Brown, Zane, and Pisenti:

I am writing on behalf of California Sportfishing Protection Alliance ("CSPA") in regard to violations of the Clean Water Act (the "Act") that CSPA believes are occurring at the County of Sonoma's facility ("Facility") located at 4376 Stage Gulch Road in Sonoma, California. The Facility operates under the name "Sonoma Transfer Station." CSPA is a non-profit public benefit corporation dedicated to the preservation, protection, and defense of the environment,

Notice of Violations and Intent to File Suit

Phillip Demery et al.
Sonoma Transfer Station
November 9, 2012
Page 2 of 20

wildlife, and natural resources of Sonoma Creek, the San Pablo Bay, and other California waters. This letter is being sent to you as the responsible owners, officers, or operators of the Facility (all recipients are hereinafter collectively referred to as "Sonoma Transfer").

This letter addresses Sonoma Transfer's unlawful discharge of pollutants from the Facility through channels that flow into Sonoma Creek. The Facility is discharging storm water pursuant to National Pollutant Discharge Elimination System ("NPDES") Permit No. CA S000001, California Regional Water Quality Control Board, San Francisco Bay Region ("Regional Board") Order No. 92-12-DWQ as amended by Order No. 97-03-DWQ (hereinafter "General Permit"). The WDID identification number for the Facility listed on documents submitted to the Regional Board is 249I006105. The Facility is engaged in ongoing violations of the substantive and procedural requirements of the General Permit.

Section 505(b) of the Clean Water Act requires a citizen to give notice of intent to file suit sixty (60) days prior to the initiation of a civil action under Section 505(a) of the Act (33 U.S.C. § 1365(a)). Notice must be given to the alleged violator, the U.S. Environmental Protection Agency ("EPA") and the State in which the violations occur.

As required by the Clean Water Act, this Notice of Violations and Intent to File Suit provides notice of the violations that have occurred, and continue to occur, at the Facility. Consequently, Sonoma Transfer is hereby placed on formal notice by CSPA that, after the expiration of sixty days from the date of this Notice of Violations and Intent to Sue, CSPA intends to file suit in federal court against Sonoma Transfer, including the responsible managers, directors, or operators, under Section 505(a) of the Clean Water Act (33 U.S.C. § 1365(a)), for violations of the Clean Water Act and the Order. These violations are described more extensively below.

I.     **Background.**

On or about March 26, 1992, the State Water Resources Control Board ("State Board") received and processed Sonoma Transfer's Notice of Intent for General Permit to Discharge Storm Water Associated with Industrial Activity ("NOI"). In its NOI, Sonoma Transfer certifies that the Facility is classified under SIC code 5093 and SIC code 4212. The Facility collects and discharges storm water from its 40-acre industrial site through at least two outfalls that discharges into channels that flow into Champlin Creek. Champlin Creek flows into Sonoma Creek, which flows into San Pablo Bay.

The Regional Board has identified beneficial uses of the Bay region's waters and established water quality standards for the San Francisco Bay in the "Water Quality Control Plan for the San Francisco Bay Basin," generally referred to as the Basin Plan. *See* http://www.waterboards.ca.gov/sanfranciscobay/water_issues/programs/planningtmdls/basinplan /web/docs/BP_all_chapters.pdf. The beneficial uses of these waters include among others contact and non-contact recreation, fish migration, endangered and threatened species habitat, shellfish harvesting, and fish spawning. The non-contact recreation use is defined as "[u]ses of

Phillip Demery et al.
Sonoma Transfer Station
November 9, 2012
Page 3 of 20

water for recreational activities involving proximity to water, but not normally involving contact with water where water ingestion is reasonably possible. These uses include, but are not limited to, picnicking, sunbathing, hiking, beachcombing, camping, boating, tide pool and marine life study, hunting, sightseeing, or aesthetic enjoyment in conjunction with the above activities. Water quality considerations relevant to non-contact water recreation, such as hiking, camping, or boating, and those activities related to tide pool or other nature studies require protection of habitats and aesthetic features." *Id.* at 2.1.16. Visible pollution, including visible sheens and cloudy or muddy water from industrial areas, impairs people's use of Champlin Creek and Sonoma Creek for contact and non-contact water recreation.

Specific beneficial uses for Sonoma Creek include commercial and sport fishing, cold freshwater habitat, fish migration, preservation of rare and endangered species, fish spawning, warm freshwater habitat, wildlife habitat, and contact and non-contact water recreation. *Id.* at Table 2-1.

The Basin Plan establishes water quality standards for Champlin Creek, Sonoma Creek, and San Pablo Bay. The Basin Plan includes a narrative toxicity standard which states that "[a]ll waters shall be maintained free of toxic substances in concentrations that are lethal or that produce other detrimental responses in aquatic organisms." *Id.* at 3.3.18. The Basin Plan provides that "[s]urface waters shall not contain concentrations of chemical constituents in amounts that adversely affect any designated beneficial use." *Id.* at 3.3.21. The Basin Plan provides that "[w]aters shall not contain suspended material in concentrations that cause nuisance or adversely affect beneficial uses." *Id.* at 3.3.14. The Basin Plan provides that "[t]he suspended sediment load and suspended sediment discharge rate of surface waters shall not be altered in such a manner as to cause nuisance or adversely affect beneficial uses." *Id.* at 3.3.12. The Basin Plan provides that "[w]aters shall be free of changes in turbidity that cause nuisance or adversely affect beneficial uses." *Id.* at 3.3.19. The Basin Plan provides that "[w]aters shall be free of coloration that causes nuisance or adversely affects beneficial uses." *Id.* at 3.3.4. The Basin Plan provides that "[w]aters shall not contain floating material, including solids, liquids, foams, and scum, in concentrations that cause nuisance or adversely affect beneficial uses." *Id.* at 3.3.6. The Basin Plan provides that "[w]aters shall not contain oils, greases, waxes, or other materials in concentrations that result in a visible film or coating on the surface of the water or on objects in the water, that cause nuisance, or that otherwise adversely affect beneficial uses." *Id.* at 3.3.7.

The Basin Plan indicates that Sonoma Creek and its tributaries are impaired by pathogens. *Id.* at 7.8. The Basin Plan indicates that municipal runoff is one of the sources of pathogens. *Id.* at 7.8.2.2. The Basin Plan also establishes a Total Maximum Daily Load for Sonoma Creek for sediment of 117,400 tons/year. *Id.* at Table 7.8.3-2. This load applies to urban stormwater runoff. *Id.*

The Basin Plan establishes Freshwater Water Quality Objectives for zinc of 0.12 mg/L (4-day average and 1-hour average); for lead of 0.0025 mg/L (4-day average) and 0.065 mg/L (1-hour average); and for copper of 0.009 mg/L (4-day average) and 0.013 mg/L (1-hour average)

Phillip Demery et al.
Sonoma Transfer Station
November 9, 2012
Page 4 of 20

*Id.* at Table 3-4. The EPA has adopted freshwater numeric water quality standards for zinc of 0.120 mg/L (Criteria Maximum Concentration – "CMC" and Criteria Continuous Concentration – "CCC"); for copper of 0.009 mg/L (CCC) and 0.013 mg/L (CMC); and for lead of 0.0025 mg/L (CCC) and 0.065 mg/L (CMC). 65 Fed.Reg. 31712 (May 18, 2000) (California Toxics Rule).

The EPA has published benchmark levels as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite best available technology economically achievable ("BAT") and best conventional pollutant control technology ("BCT"). The following benchmarks have been established for pollutants discharged by Sonoma Transfer: pH – 6.0 - 9.0 units; total suspended solids ("TSS") – 100 mg/L, oil and grease ("O&G") – 15 mg/L, total organic carbon ("TOC") – 110 mg/L, zinc – 0.117 mg/L, aluminum – 0.75 mg/L, magnesium – 0.0636 mg/L, lead – 0.0816 mg/L, chemical oxygen demand ("COD") – 120 mg/L, copper – 0.0636 mg/L, and iron – 1.0 mg/L.

## II.    Alleged Violations of the NPDES Permit.

### A.    *Discharges in Violation of the Permit.*

Sonoma Transfer has violated and continues to violate the terms and conditions of the General Industrial Storm Water Permit. Section 402(p) of the Act prohibits the discharge of storm water associated with industrial activities, except as permitted under an NPDES permit (33 U.S.C. § 1342) such as the General Permit. The General Permit prohibits any discharges of storm water associated with industrial activities or authorized non-storm water discharges that have not been subjected to BAT or BCT. Effluent Limitation B(3) of the General Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants. BAT and BCT include both nonstructural and structural measures. General Permit, Section A(8). Conventional pollutants are TSS, O&G, pH, biochemical oxygen demand ("BOD"), and fecal coliform. 40 C.F.R. § 401.16. All other pollutants are either toxic or nonconventional. *Id.*; 40 C.F.R. § 401.15.

In addition, Discharge Prohibition A(1) of the General Permit prohibits the discharge of materials other than storm water (defined as non-storm water discharges) that discharge either directly or indirectly to waters of the United States. Discharge Prohibition A(2) of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.

Receiving Water Limitation C(1) of the General Industrial Storm Water Permit prohibits storm water discharges and authorized non-storm water discharges to surface or groundwater that adversely impact human health or the environment. Receiving Water Limitation C(2) of the General Permit also prohibits storm water discharges and authorized non-storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan. The

Notice of Violations and Intent to File Suit

Phillip Demery et al.
Sonoma Transfer Station
November 9, 2012
Page 5 of 20

General Permit does not authorize the application of any mixing zones for complying with
Receiving Water Limitation C(2). As a result, compliance with this provision is measured at the
Facility's discharge monitoring location.

Sonoma Transfer has discharged and continues to discharge storm water with
unacceptable levels of TSS, specific conductivity, O&G, TOC, zinc, aluminum, iron,
magnesium, lead, COD, copper, and other pollutants in violation of the General Permit. Sonoma
Transfer's sampling and analysis results reported to the Regional Board confirm discharges of
specific pollutants and materials other than storm water in violation of the Permit provisions
listed above. Self-monitoring reports under the Permit are deemed "conclusive evidence of an
exceedance of a permit limitation." *Sierra Club v. Union Oil*, 813 F.2d 1480, 1493 (9th Cir.
1988).

The following discharges of pollutants from the Facility have contained levels of
pollutants in excess of numeric and narrative water quality standards established in the Basin
Plan and have thus violated Discharge Prohibitions A(1) and A(2) and Receiving Water
Limitations C(1) and C(2) and are evidence of ongoing violations of Effluent Limitation B(3) of
the General Industrial Storm Water Permit.

| Date | Parameter | Observed Concentration | Basin Plan Water Quality Objective | Location (as identified by the Facility) |
|------|-----------|------------------------|------------------------------------|------------------------------------------|
| 1/19/2012 | Zinc | 0.63 mg/L | 0.12 mg/L (1-hour average and 4-day average) | SW-4 |
| 10/3/2011 | Zinc | 0.74 mg/L | 0.12 mg/L (1-hour average and 4-day average) | SW-4 |
| 10/3/2011 | Zinc | 0.2 mg/L | 0.12 mg/L (1-hour average and 4-day average) | SW-3 |
| 1/3/2011 | Zinc | 0.15 mg/L | 0.12 mg/L (1-hour average and 4-day average) | SW-4 |
| 10/22/2010 | Zinc | 0.65 mg/L | 0.12 mg/L (1-hour average and 4-day average) | SW-4 |
| 1/12/2010 | Zinc | 0.23 mg/L | 0.12 mg/L (1-hour average and 4-day average) | SW-3 |
| 10/13/2009 | Zinc | 0.22 mg/L | 0.12 mg/L (1-hour average and 4-day average) | SW-4 |
| 10/13/2009 | Zinc | 0.13 mg/L | 0.12 mg/L (1-hour | SW-3 |

Notice of Violations and Intent to File Suit

Phillip Demery et al.
Sonoma Transfer Station
November 9, 2012
Page 6 of 20

| | | | average and 4-day average) | |
|---|---|---|---|---|
| 11/3/2008 | Zinc | 0.21 mg/L | 0.12 mg/L (1-hour average and 4-day average) | SW-4 |
| 1/3/2008 | Zinc | 0.48 mg/L | 0.12 mg/L (1-hour average and 4-day average) | SW-4 |
| 1/3/2008 | Zinc | 0.42 mg/L | 0.12 mg/L (1-hour average and 4-day average) | SW-3 |
| 1/19/2012 | Lead | 0.11 mg/L | 0.0025 mg/L (4-day average) | SW-4 |
| 1/19/2012 | Lead | 0.11 mg/L | 0.065 mg/L (1-hour average) | SW-4 |
| 10/3/2011 | Lead | 0.13 mg/L | 0.0025 mg/L (4-day average) | SW-4 |
| 10/3/2011 | Lead | 0.13 mg/L | 0.065 mg/L (1-hour average) | SW-4 |
| 10/3/2011 | Lead | 0.03 mg/L | 0.0025 mg/L (4-day average) | SW-3 |
| 1/13/2011 | Lead | 0.01 mg/L | 0.0025 mg/L (4-day average) | SW-4 |
| 1/13/2011 | Lead | 0.01 mg/L | 0.065 mg/L (1-hour average) | SW-3 |
| 10/22/2010 | Lead | 0.14 mg/L | 0.0025 mg/L (4-day average) | SW-4 |
| 10/22/2010 | Lead | 0.14 mg/L | 0.065 mg/L (1-hour average) | SW-4 |
| 10/22/2010 | Lead | 0.0069 mg/L | 0.0025 mg/L (4-day average) | SW-3 |
| 1/12/2010 | Lead | 0.0072 mg/L | 0.0025 mg/L (4-day average) | SW-4 |
| 10/13/2009 | Lead | 0.018 mg/L | 0.0025 mg/L (4-day average) | SW-4 |
| 10/13/2009 | Lead | 0.032 mg/L | 0.0025 mg/L (4-day average) | SW-3 |
| 2/13/2009 | Lead | 0.0049 mg/L | 0.0025 mg/L (4-day average) | SW-4 |
| 2/13/2009 | Lead | 0.0032 mg/L | 0.0025 mg/L (4-day average) | SW-3 |
| 11/3/2008 | Lead | 0.031 mg/L | 0.0025 mg/L (4-day average) | SW-4 |

Notice of Violations and Intent to File Suit

Phillip Demery et al.
Sonoma Transfer Station
November 9, 2012
Page 7 of 20

| 11/3/2008 | Lead | 0.24 mg/L | 0.0025 mg/L (4-day average) | SW-3 |
|---|---|---|---|---|
| 11/3/2008 | Lead | 0.24 mg/L | 0.065 mg/L (1-hour average) | SW-3 |
| 1/3/2008 | Lead | 0.078 mg/L | 0.0025 mg/L (4-day average) | SW-4 |
| 1/3/2008 | Lead | 0.078 mg/L | 0.065 mg/L (1-hour average) | SW-4 |
| 1/3/2008 | Lead | 0.081 mg/L | 0.0025 mg/L (4-day average) | SW-3 |
| 1/3/2008 | Lead | 0.081 mg/L | 0.065 mg/L (1-hour average) | SW-3 |
| 1/19/2012 | Copper | 0.12 mg/L | 0.013 mg/L (1-hour average) | SW-4 |
| 1/19/2012 | Copper | 0.12 mg/L | 0.009 mg/L (4-day average) | SW-4 |
| 10/3/2011 | Copper | 0.15 mg/L | 0.013 mg/L (1-hour average) | SW-4 |
| 10/3/2011 | Copper | 0.15 mg/L | 0.009 mg/L (4-day average) | SW-4 |
| 10/3/2011 | Copper | 0.069 mg/L | 0.013 mg/L (1-hour average) | SW-3 |
| 10/3/2011 | Copper | 0.069 mg/L | 0.009 mg/L (4-day average) | SW-3 |
| 1/13/2011 | Copper | 0.02 mg/L | 0.013 mg/L (1-hour average) | SW-4 |
| 1/13/2011 | Copper | 0.02 mg/L | 0.009 mg/L (4-day average) | SW-4 |
| 10/22/2010 | Copper | 0.1 mg/L | 0.013 mg/L (1-hour average) | SW-4 |
| 10/22/2010 | Copper | 0.1 mg/L | 0.009 mg/L (4-day average) | SW-4 |
| 10/22/2010 | Copper | 0.063 mg/L | 0.013 mg/L (1-hour average) | SW-3 |
| 10/22/2010 | Copper | 0.063 mg/L | 0.009 mg/L (4-day average) | SW-3 |
| 1/12/2010 | Copper | 0.017 mg/L | 0.013 mg/L (1-hour average) | SW-4 |
| 1/12/2010 | Copper | 0.017 mg/L | 0.009 mg/L (4-day average) | SW-4 |
| 1/12/2010 | Copper | 0.015 mg/L | 0.013 mg/L (1-hour average) | SW-3 |
| 1/12/2010 | Copper | 0.015 mg/L | 0.009 mg/L (4-day | SW-3 |

Notice of Violations and Intent to File Suit

Phillip Demery et al.
Sonoma Transfer Station
November 9, 2012
Page 8 of 20

| | | | average) | |
|---|---|---|---|---|
| 10/13/2009 | Copper | 0.08 mg/L | 0.013 mg/L (1-hour average) | SW-4 |
| 10/13/2009 | Copper | 0.08 mg/L | 0.009 mg/L (4-day average) | SW-4 |
| 10/13/2009 | Copper | 0.029 mg/L | 0.013 mg/L (1-hour average) | SW-3 |
| 10/13/2009 | Copper | 0.029 mg/L | 0.009 mg/L (4-day average) | SW-3 |
| 1/3/2008 | Copper | 0.07 mg/L | 0.013 mg/L (1-hour average) | SW-4 |
| 1/3/2008 | Copper | 0.07 mg/L | 0.009 mg/L (4-day average) | SW-4 |
| 1/3/2008 | Copper | 0.077 mg/L | 0.013 mg/L (1-hour average) | SW-3 |
| 1/3/2008 | Copper | 0.077 mg/L | 0.009 mg/L (4-day average) | SW-3 |
| 5/3/2012 | Narrative | Low turbidity/Gray-brown color | Basin Plan 3.3.19 / Basin Plan 3.3.4 | SW-3 |
| 5/3/2012 | Narrative | Low turbidity/Gray-brown color | Basin Plan 3.3.19 / Basin Plan 3.3.4 | SW-4 |
| 4/10/2012 | Narrative | Moderate turbidity/Gray-brown color | Basin Plan 3.3.19 / Basin Plan 3.3.4 | SW-3 |
| 4/10/2012 | Narrative | Moderate turbidity/Gray-brown color | Basin Plan 3.3.19 / Basin Plan 3.3.4 | SW-4 |
| 3/13/2012 | Narrative | Low turbidity/Brown color | Basin Plan 3.3.19 / Basin Plan 3.3.4 | SW-3 |
| 3/13/2012 | Narrative | Low turbidity/Gray-brown color | Basin Plan 3.3.19 / Basin Plan 3.3.4 | SW-4 |
| 1/19/2012 | Narrative | Low Turbidity/Gray-Brown Color | Basin Plan 3.3.19 / Basin Plan 3.3.4 | SW-3 |
| 1/19/2012 | Narrative | Low Turbidity/Gray-Brown Color | Basin Plan 3.3.19 / Basin Plan 3.3.4 | SW-4 |
| 5/25/2011 | Narrative | Heavy turbidity/Dark | Basin Plan 3.3.19 / Basin Plan 3.3.4 | SW-3 |

Notice of Violations and Intent to File Suit

Phillip Demery et al.
Sonoma Transfer Station
November 9, 2012
Page 9 of 20

| | | brown color | | |
|---|---|---|---|---|
| 5/25/2011 | Narrative | Moderate turbidity/Gray-brown color | Basin Plan 3.3.19 / Basin Plan 3.3.4 | SW-4 |
| 4/13/2011 | Narrative | Light turbidity/Gray color | Basin Plan 3.3.19 / Basin Plan 3.3.4 | SW-3 |
| 2/14/2011 | Narrative | Low turbidity/brown color | Basin Plan 3.3.19 / Basin Plan 3.3.4 | SW-3 |
| 1/13/2011 | Narrative | Minor turbidity/Brown color | Basin Plan 3.3.19 / Basin Plan 3.3.4 | SW-3 |
| 1/13/2011 | Narrative | Minor turbidity/Brown color | Basin Plan 3.3.19 / Basin Plan 3.3.4 | SW-4 |
| 10/28/2010 | Narrative | High turbidity/Gray color | Basin Plan 3.3.19 / Basin Plan 3.3.4 | SW-3 |
| 10/28/2010 | Narrative | High turbidity/Gray color | Basin Plan 3.3.19 / Basin Plan 3.3.4 | SW-3 |
| 10/28/2010 | Narrative | High turbidity/Gray color | Basin Plan 3.3.19 / Basin Plan 3.3.4 | SW-4 |

The information in the above table reflects data gathered from Sonoma Transfer's self-monitoring during the 2007-2008, 2008-2009, 2009-2010, 2010-2011, and 2011-2012 wet seasons. CSPA alleges that during each of those wet seasons and continuing through today, Sonoma Transfer has discharged storm water contaminated with pollutants at levels that exceed one or more applicable water quality standards, including but not limited to each of the following:

- o Zinc – 0.12 mg/L (1-hour average and 4-day average)
- o Lead – 0.0025 mg/L (4-day average)
- o Lead – 0.065 mg/L (1-hour average)
- o Copper – 0.009 mg/L (4-day average)
- o Copper – 0.013 mg/L (1-hour average)
- o Turbidity – Waters shall be free of changes in turbidity that cause nuisance or adversely affect beneficial uses.
- o Color – Waters shall be free of coloration that causes nuisance or adversely affects beneficial uses.

Notice of Violations and Intent to File Suit

Phillip Demery et al.
Sonoma Transfer Station
November 9, 2012
Page 10 of 20

    The following discharges of pollutants from the Facility have violated Discharge
Prohibitions A(1) and A(2) and Receiving Water Limitations C(1) and C(2) and are evidence of
ongoing violations of Effluent Limitation B(3) of the General Industrial Storm Water Permit.

| Date | Parameter | Observed Concentration | EPA Benchmark Value | Outfall (as identified by the Facility) |
|------|-----------|------------------------|---------------------|------------------------------------------|
| 1/19/2012 | Total Suspended Solids | 1200 mg/L | 100 mg/L | SW-4 |
| 1/19/2012 | Specific Conductivity | 1100 µmho/cm | 200 µmho/cm (proposed) | SW-4 |
| 1/19/2012 | Total Organic Carbon | 146 mg/L | 110 mg/L | SW-4 |
| 1/19/2012 | Zinc | 0.63 mg/L | 0.117 mg/L | SW-4 |
| 1/19/2012 | Aluminum | 9.9 mg/L | 0.75 mg/L | SW-4 |
| 1/19/2012 | Iron | 13 mg/L | 1.0 mg/L | SW-4 |
| 1/19/2012 | Magnesium | 50 mg/L | 0.0636 mg/L | SW-4 |
| 1/19/2012 | Lead | 0.11 mg/L | 0.0816 mg/L | SW-4 |
| 1/19/2012 | Chemical Oxygen Demand | 400 mg/L | 120 mg/L | SW-4 |
| 1/19/2012 | Copper | 0.12 mg/L | 0.0636 mg/L | SW-4 |
| 1/19/2012 | Specific Conductivity | 520 µmho/cm | 200 µmho/cm (proposed) | SW-3 |
| 1/19/2012 | Magnesium | 20 mg/L | 0.0636 mg/L | SW-3 |
| 10/3/2011 | Total Suspended Solids | 260 mg/L | 100 mg/L | SW-4 |
| 10/3/2011 | Oil & Grease | 33 mg/L | 15 mg/L | SW-4 |
| 10/3/2011 | Total Organic Carbon | 213 mg/L | 110 mg/L | SW-4 |
| 10/3/2011 | Zinc | 0.74 mg/L | 0.117 mg/L | SW-4 |
| 10/3/2011 | Aluminum | 9.5 mg/L | 0.75 mg/L | SW-4 |
| 10/3/2011 | Iron | 13 mg/L | 1.0 mg/L | SW-4 |
| 10/3/2011 | Magnesium | 36 mg/L | 0.0636 mg/L | SW-4 |
| 10/3/2011 | Lead | 0.13 mg/L | 0.0816 mg/L | SW-4 |
| 10/3/2011 | Chemical Oxygen Demand | 820 mg/L | 120 mg/L | SW-4 |
| 10/3/2011 | Copper | 0.15 mg/L | 0.0636 mg/L | SW-4 |
| 10/3/2011 | Total Suspended Solids | 110 mg/L | 100 mg/L | SW-3 |
| 10/3/2011 | Total Organic Carbon | 178 mg/L | 110 mg/L | SW-3 |
| 10/3/2011 | Zinc | 0.2 mg/L | 0.117 mg/L | SW-3 |
| 10/3/2011 | Aluminum | 4 mg/L | 0.75 mg/L | SW-3 |
| 10/3/2011 | Iron | 4.6 mg/L | 1.0 mg/L | SW-3 |
| 10/3/2011 | Magnesium | 14 mg/L | 0.0636 mg/L | SW-3 |
| 10/3/2011 | Chemical Oxygen Demand | 590 mg/L | 120 mg/L | SW-3 |
| 10/3/2011 | Copper | 0.069 mg/L | 0.0636 mg/L | SW-3 |
| 1/13/2011 | Zinc | 0.15 mg/L | 0.117 mg/L | SW-4 |
| 1/13/2011 | Aluminum | 1.2 mg/L | 0.75 mg/L | SW-4 |
| 1/13/2011 | Iron | 1.4 mg/L | 1.0 mg/L | SW-4 |
| 1/13/2011 | Magnesium | 25 mg/L | 0.0636 mg/L | SW-4 |

Notice of Violations and Intent to File Suit

Phillip Demery et al.
Sonoma Transfer Station
November 9, 2012
Page 11 of 20

| 1/13/2011 | Aluminum | 3 mg/L | 0.75 mg/L | SW-3 |
|-----------|----------|--------|-----------|------|
| 1/13/2011 | Iron | 2 mg/L | 1.0 mg/L | SW-3 |
| 1/13/2011 | Magnesium | 16 mg/L | 0.0636 mg/L | SW-3 |
| 10/22/2010 | Total Suspended Solids | 790 mg/L | 100 mg/L | SW-4 |
| 10/22/2010 | Zinc | 0.65 mg/L | 0.117 mg/L | SW-4 |
| 10/22/2010 | Aluminum | 11 mg/L | 0.75 mg/L | SW-4 |
| 10/22/2010 | Iron | 15 mg/L | 1.0 mg/L | SW-4 |
| 10/22/2010 | Magnesium | 2.9 mg/L | 0.0636 mg/L | SW-4 |
| 10/22/2010 | Lead | 0.14 mg/L | 0.0816 mg/L | SW-4 |
| 10/22/2010 | Chemical Oxygen Demand | 800 mg/L | 120 mg/L | SW-4 |
| 10/22/2010 | Copper | 0.1 mg/L | 0.0636 mg/L | SW-4 |
| 10/22/2010 | Total Organic Carbon | 138 mg/L | 110 mg/L | SW-3 |
| 10/22/2010 | Aluminum | 2.8 mg/L | 0.75 mg/L | SW-3 |
| 10/22/2010 | Iron | 3 mg/L | 1.0 mg/L | SW-3 |
| 10/22/2010 | Magnesium | 17 mg/L | 0.0636 mg/L | SW-3 |
| 10/22/2010 | Chemical Oxygen Demand | 460 mg/L | 120 mg/L | SW-3 |
| 1/12/2010 | Zinc | 0.12 mg/L | 0.117 mg/L | SW-4 |
| 1/12/2010 | Aluminum | 0.99 mg/L | 0.75 mg/L | SW-4 |
| 1/12/2010 | Iron | 1.3 mg/L | 1.0 mg/L | SW-4 |
| 1/12/2010 | Magnesium | 18 mg/L | 0.0636 mg/L | SW-4 |
| 1/12/2010 | Zinc | 0.23 mg/L | 0.117 mg/L | SW-3 |
| 1/12/2010 | Aluminum | 5.4 mg/L | 0.75 mg/L | SW-3 |
| 1/12/2010 | Iron | 4.4 mg/L | 1.0 mg/L | SW-3 |
| 1/12/2010 | Magnesium | 15 mg/L | 0.0636 mg/L | SW-3 |
| 10/13/2009 | Zinc | 0.22 mg/L | 0.117 mg/L | SW-4 |
| 10/13/2009 | Aluminum | 1.7 mg/L | 0.75 mg/L | SW-4 |
| 10/13/2009 | Iron | 2.2 mg/L | 1.0 mg/L | SW-4 |
| 10/13/2009 | Magnesium | 16 mg/L | 0.0636 mg/L | SW-4 |
| 10/13/2009 | Chemical Oxygen Demand | 300 mg/L | 120 mg/L | SW-4 |
| 10/13/2009 | Copper | 0.08 mg/L | 0.0636 mg/L | SW-4 |
| 10/13/2009 | Total Suspended Solids | 240 mg/L | 100 mg/L | SW-3 |
| 10/13/2009 | Oil & Grease | 17 mg/L | 15 mg/L | SW-3 |
| 10/13/2009 | Zinc | 0.13 mg/L | 0.117 mg/L | SW-3 |
| 10/13/2009 | Aluminum | 11 mg/L | 0.75 mg/L | SW-3 |
| 10/13/2009 | Iron | 10 mg/L | 1.0 mg/L | SW-3 |
| 10/13/2009 | Magnesium | 6.8 mg/L | 0.0636 mg/L | SW-3 |
| 10/13/2009 | Chemical Oxygen Demand | 150 mg/L | 120 mg/L | SW-3 |
| 2/13/2009 | Aluminum | 2.4 mg/L | 0.75 mg/L | SW-4 |
| 2/13/2009 | Iron | 2.1 mg/L | 1.0 mg/L | SW-4 |
| 2/13/2009 | Aluminum | 21 mg/L | 0.75 mg/L | SW-3 |
| 2/13/2009 | Iron | 16 mg/L | 1.0 mg/L | SW-3 |
| 11/3/2008 | Total Suspended Solids | 130 mg/L | 100 mg/L | SW-4 |

Notice of Violations and Intent to File Suit

Phillip Demery et al.
Sonoma Transfer Station
November 9, 2012
Page 12 of 20

| 11/3/2008 | Zinc | 0.21 mg/L | 0.117 mg/L | SW-4 |
|---|---|---|---|---|
| 11/3/2008 | Aluminum | 3.6 mg/L | 0.75 mg/L | SW-4 |
| 11/3/2008 | Total Suspended Solids | 140 mg/L | 100 mg/L | SW-3 |
| 11/3/2008 | Zinc | 0.12 mg/L | 0.117 mg/L | SW-3 |
| 11/3/2008 | Aluminum | 7.3 mg/L | 0.75 mg/L | SW-3 |
| 11/3/2008 | Iron | 7.6 mg/L | 1.0 mg/L | SW-3 |
| 11/3/2008 | Lead | 0.24 mg/L | 0.0816 mg/L | SW-3 |
| 1/3/2008 | Total Suspended Solids | 310 mg/L | 100 mg/L | SW-4 |
| 1/3/2008 | Zinc | 0.48 mg/L | 0.117 mg/L | SW-4 |
| 1/3/2008 | Aluminum | 13 mg/L | 0.75 mg/L | SW-4 |
| 1/3/2008 | Iron | 17 mg/L | 1.0 mg/L | SW-4 |
| 1/3/2008 | Magnesium | 9.1 mg/L | 0.0636 mg/L | SW-4 |
| 1/3/2008 | Chemical Oxygen Demand | 410 mg/L | 120 mg/L | SW-4 |
| 1/3/2008 | Copper | 0.07 mg/L | 0.0636 mg/L | SW-4 |
| 1/3/2008 | Total Suspended Solids | 560 mg/L | 100 mg/L | SW-3 |
| 1/3/2008 | Zinc | 0.42 mg/L | 0.117 mg/L | SW-3 |
| 1/3/2008 | Aluminum | 27 mg/L | 0.75 mg/L | SW-3 |
| 1/3/2008 | Iron | 36 mg/L | 1.0 mg/L | SW-3 |
| 1/3/2008 | Magnesium | 16 mg/L | 0.0636 mg/L | SW-3 |
| 1/3/2008 | Chemical Oxygen Demand | 370 mg/L | 120 mg/L | SW-3 |
| 1/3/2008 | Copper | 0.077 mg/L | 0.0636 mg/L | SW-3 |

The information in the above table reflects data gathered from Sonoma Transfer's self-monitoring during the 2007-2008, 2008-2009, 2009-2010, 2010-2011, and 2011-2012 wet seasons. CSPA alleges that during each of those wet seasons and continuing through today, Sonoma Transfer has discharged storm water contaminated with pollutants at levels that exceed one or more applicable EPA Benchmarks, including but not limited to each of the following:

- o  Total Suspended Solids – 100 mg/L
- o  Total Organic Carbon – 110 mg/L
- o  Zinc – 0.117 mg/L
- o  Aluminum – 0.75 mg/L
- o  Iron – 1.0 mg/L
- o  Magnesium – 0.0636 mg/L
- o  Lead – 0.0816 mg/L
- o  Chemical Oxygen Demand – 120 mg/L
- o  Oil & Grease – 15 mg/L
- o  Copper – 0.0636 mg/L

CSPA's investigation, including its review of Sonoma Transfer's analytical results documenting pollutant levels in the Facility's storm water discharges well in excess of EPA's benchmark values and the State Board's proposed benchmark for electrical conductivity, indicates that Sonoma Transfer has not implemented BAT and BCT at the Facility for its

Phillip Demery et al.
Sonoma Transfer Station
November 9, 2012
Page 13 of 20

discharges of TSS, specific conductivity, O&G, TOC, zinc, aluminum, iron, magnesium, lead, COD, copper, and other pollutants in violation of Effluent Limitation B(3) of the General Permit. Sonoma Transfer was required to have implemented BAT and BCT by no later than October 1, 1992. Thus, Sonoma Transfer is discharging polluted storm water associated with its industrial operations without having implemented BAT and BCT.

In addition, the numbers listed above indicate that the Facility is discharging polluted storm water in violation of Discharge Prohibitions A(1) and A(2) and Receiving Water Limitations C(1) and C(2) of the General Permit. CSPA alleges that such violations also have occurred and will occur on other rain dates, including every significant rain event that has occurred since November 5, 2007, and that will occur at the Facility subsequent to the date of this Notice of Violation and Intent to File Suit. Attachment A, attached hereto, sets forth each of the specific rain dates on which CSPA alleges that Sonoma Transfer has discharged storm water containing impermissible levels of TSS, specific conductivity, O&G, TOC, zinc, aluminum, iron, magnesium, lead, COD, and copper in violation of Effluent Limitation B(3), Discharge Prohibitions A(1) and A(2), and Receiving Water Limitations C(1) and C(2) of the General Permit.[1]

These unlawful discharges from the Facility are ongoing. Each discharge of storm water containing any of these pollutants constitutes a separate violation of the General Industrial Storm Water Permit and the Act. Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, Sonoma Transfer is subject to penalties for violations of the General Permit and the Act since November 5, 2007.

## B. Failure to Develop and Implement an Adequate Monitoring and Reporting Program

Section B of the General Permit describes the monitoring requirements for storm water and non-storm water discharges. Facilities are required to make monthly visual observations of storm water discharges (Section B(4)) and quarterly visual observations of both unauthorized and authorized non-storm water discharges (Section B(3)). Section B(5) requires facility operators to sample and analyze at least two storm water discharges from all storm water discharge locations during each wet season. Section B(7) requires that the visual observations and samples must represent the "quality and quantity of the facility's storm water discharges from the storm event."

The above referenced data was obtained from the Facility's monitoring program as reported in its Annual Reports submitted to the Regional Board. This data is evidence that the Facility has violated various Discharge Prohibitions, Receiving Water Limitations, and Effluent Limitations in the General Permit. To the extent the storm water data collected by Sonoma Transfer is not representative of the quality of the Facility's various storm water discharges and

---

[1] The rain dates are all the days when 0.1" or more rain fell as measured by a weather station nearby the facility in Sonoma.

Phillip Demery et al.
Sonoma Transfer Station
November 9, 2012
Page 14 of 20

that the Facility failed to monitor all qualifying storm water discharges, CSPA, alleges that the
Facility's monitoring program violates Sections B(3), (4), (5) and (7) of the General Permit.

In addition, the copies of Sonoma Transfer's Annual Reports available to CSPA for the
2007-2008, 2008-2009, and 2009-2010 wet seasons did not contain records of any visual
observations, in violation of Section B of the General Permit. On information and belief, CSPA
alleges that Sonoma Transfer did not conduct any of the required monthly and quarterly visual
observations during those wet seasons.

The above violations are ongoing. Consistent with the five-year statute of limitations
applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act,
Sonoma Transfer is subject to penalties for violations of the General Permit and the Act's
monitoring and sampling requirements since November 5, 2007.

## C. Failure to Prepare, Implement, Review and Update an Adequate Storm Water Pollution Prevention Plan.

Section A and Provision E(2) of the General Industrial Storm Water Permit require
dischargers of storm water associated with industrial activity to develop, implement, and update
an adequate storm water pollution prevention plan ("SWPPP") no later than October 1, 1992.
Section A(1) and Provision E(2) requires dischargers who submitted an NOI pursuant to the
General Permit to continue following their existing SWPPP and implement any necessary
revisions to their SWPPP in a timely manner, but in any case, no later than August 1, 1997 [or
that subsequent date subsequent that a facility obtains coverage under the General Permit].

The SWPPP must, among other requirements, identify and evaluate sources of pollutants
associated with industrial activities that may affect the quality of storm and non-storm water
discharges from the facility and identify and implement site-specific best management practices
("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water and
authorized non-storm water discharges (General Permit, Section A(2)). The SWPPP must
include BMPs that achieve BAT and BCT (Effluent Limitation B(3)). The SWPPP must
include: a description of individuals and their responsibilities for developing and implementing
the SWPPP (General Permit, Section A(3)); a site map showing the facility boundaries, storm
water drainage areas with flow pattern and nearby water bodies, the location of the storm water
collection, conveyance and discharge system, structural control measures, impervious areas,
areas of actual and potential pollutant contact, and areas of industrial activity (General Permit,
Section A(4)); a list of significant materials handled and stored at the site (General Permit,
Section A(5)); a description of potential pollutant sources including industrial processes, material
handling and storage areas, dust and particulate generating activities, a description of significant
spills and leaks, a list of all non-storm water discharges and their sources, and a description of
locations where soil erosion may occur (General Permit, Section A(6)).

The SWPPP also must include an assessment of potential pollutant sources at the Facility
and a description of the BMPs to be implemented at the Facility that will reduce or prevent

Notice of Violations and Intent to File Suit

Phillip Demery et al.
Sonoma Transfer Station
November 9, 2012
Page 15 of 20

pollutants in storm water discharges and authorized non-storm water discharges, including structural BMPs where non-structural BMPs are not effective (General Permit, Section A(7), (8)). The SWPPP must be evaluated to ensure effectiveness and must be revised where necessary (General Permit, Section A(9),(10)).

CSPA's investigation of the conditions at the Facility as well as Sonoma Transfer's Annual Reports indicate that Sonoma Transfer has been operating with an inadequately developed or implemented SWPPP in violation of the requirements set forth above. Sonoma Transfer has failed to evaluate the effectiveness of its BMPs and to revise its SWPPP as necessary. Sonoma Transfer has been in continuous violation of Section A and Provision E(2) of the General Permit every day since November 5, 2007, at the very latest, and will continue to be in violation every day that Sonoma Transfer fails to prepare, implement, review, and update an effective SWPPP. Sonoma Transfer is subject to penalties for violations of the Order and the Act occurring since November 5, 2007.

### D. Failure to File True and Correct Annual Reports.

Section B(14) of the General Permit requires dischargers to submit an Annual Report by July 1st of each year to the executive officer of the relevant Regional Board. The Annual Report must be signed and certified by an appropriate corporate officer. General Permit, Sections B(14), C(9), (10). Section A(9)(d) of the General Industrial Storm Water Permit requires the discharger to include in their annual report an evaluation of their storm water controls, including certifying compliance with the General Industrial Storm Water Permit. *See also* General Permit, Sections C(9) and (10) and B(14).

For the 2010-2011 and the 2011-2012 wet season, Sonoma Transfer and its agent, Trish Pisenti, inaccurately certified in their Annual Reports that the Facility was in compliance with the General Permit. Consequently, Sonoma Transfer has violated Sections A(9)(d), B(14) and C(9) & (10) of the General Industrial Storm Water Permit every time Sonoma Transfer failed to submit a complete or correct report and every time Sonoma Transfer or its agents falsely purported to comply with the Act. On and information and belief, CSPA alleges that Sonoma Transfer inaccurately certified in its 2007-2008, 2008-2009, and 2009-2010 Annual Reports that the Facility is in compliance with the General Permit. Sonoma Transfer is subject to penalties for violations of Section (C) of the General Industrial Storm Water Permit and the Act occurring since June 30, 2008.

### III. Persons Responsible for the Violations.

CSPA puts Sonoma Transfer, Phillip Demery, Susan Klassen, Valerie Brown, David Rabbitt, Shirlee Zane, Mike McGuire, Efren Carrillo, and Trish Pisenti on notice that they are the persons responsible for the violations described above. If additional persons are subsequently identified as also being responsible for the violations set forth above, CSPA puts Sonoma Transfer, Phillip Demery, Susan Klassen, Valerie Brown, David Rabbitt, Shirlee Zane, Mike

Phillip Demery et al.
Sonoma Transfer Station
November 9, 2012
Page 16 of 20

McGuire, Efren Carrillo, and Trish Pisenti on notice that it intends to include those persons in this action.

## IV. Name and Address of Noticing Parties.

The name, address and telephone number of California Sportfishing Protection Alliance is as follows:

Bill Jennings, Executive Director;
California Sportfishing Protection Alliance,
3536 Rainier Avenue,
Stockton, CA 95204
Tel. (209) 464-5067
Fax (209) 464-1028
E-Mail: deltakeep@me.com

## V. Counsel.

CSPA has retained our office to represent it in this matter. Please direct all communications to:

Michael R. Lozeau
Douglas J. Chermak
Lozeau Drury LLP
410 12th Street, Suite 250
Oakland, California 94607
Tel. (510) 836-4200
michael@lozeaudrury.com
doug@lozeaudrury.com

## VI. Penalties.

Pursuant to Section 309(d) of the Act (33 U.S.C. § 1319(d)) and the Adjustment of Civil Monetary Penalties for Inflation (40 C.F.R. § 19.4) each separate violation of the Act subjects Sonoma Transfer to a penalty of up to $32,500 per day per violation for all violations occurring during the period commencing five years prior to the date of this Notice of Violations and Intent to File Suit through January 12, 2009, and a maximum of $37,500 per day per violation for all violations occurring after January 12, 2009. In addition to civil penalties, CSPA will seek injunctive relief preventing further violations of the Act pursuant to Sections 505(a) and (d) (33 U.S.C. §1365(a) and (d)) and such other relief as permitted by law. Lastly, Section 505(d) of the Act (33 U.S.C. § 1365(d)), permits prevailing parties to recover costs and fees, including attorneys' fees.

Notice of Violations and Intent to File Suit

Phillip Demery et al.
Sonoma Transfer Station
November 9, 2012
Page 17 of 20

      CSPA believes this Notice of Violations and Intent to File Suit sufficiently states grounds for filing suit. CSPA intends to file a citizen suit under Section 505(a) of the Act against Sonoma Transfer and its agents for the above-referenced violations upon the expiration of the 60-day notice period. However, during the 60-day notice period, CSPA would be willing to discuss effective remedies for the violations noted in this letter. If you wish to pursue such discussions in the absence of litigation, CSPA suggests that you initiate those discussions within the next 20 days so that they may be completed before the end of the 60-day notice period. CSPA does not intend to delay the filing of a complaint in federal court if discussions are continuing when that period ends.

      Sincerely,

Douglas J. Chermak
Lozeau Drury LLP
Attorneys for California Sportfishing Protection Alliance

Notice of Violations and Intent to File Suit

## **SERVICE LIST**

Lisa Jackson, Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

Thomas Howard, Executive Director
State Water Resources Control Board
P.O. Box 100
Sacramento, CA 95812-0100

Eric Holder, U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001

Jared Blumenfeld, Regional Administrator
U.S. EPA – Region 9
75 Hawthorne Street
San Francisco, CA, 94105

Bruce H. Wolfe, Executive Officer II
San Francisco Bay Regional Water Quality Control Board
1515 Clay Street, Suite 1400
Oakland, CA 94612

## ATTACHMENT A
Rain Dates, Sonoma Transfer Station, Sonoma, California

| | | |
|---|---|---|
| 11/11/2007 | 11/4/2008 | 10/19/2009 |
| 12/4/2007 | 11/9/2008 | 10/20/2009 |
| 12/6/2007 | 12/14/2008 | 11/6/2009 |
| 12/7/2007 | 12/15/2008 | 11/20/2009 |
| 12/17/2007 | 12/16/2008 | 12/11/2009 |
| 12/18/2007 | 12/19/2008 | 12/12/2009 |
| 12/20/2007 | 12/24/2008 | 12/13/2009 |
| 12/28/2007 | 12/25/2008 | 12/16/2009 |
| 12/29/2007 | 1/2/2009 | 12/21/2009 |
| 1/3/2008 | 1/24/2009 | 12/25/2009 |
| 1/4/2008 | 2/5/2009 | 12/27/2009 |
| 1/5/2008 | 2/6/2009 | 12/30/2009 |
| 1/6/2008 | 2/9/2009 | 1/2/2010 |
| 1/7/2008 | 2/11/2009 | 1/12/2010 |
| 1/8/2008 | 2/13/2009 | 1/13/2010 |
| 1/10/2008 | 2/14/2009 | 1/14/2010 |
| 1/23/2008 | 2/15/2009 | 1/17/2010 |
| 1/24/2008 | 2/16/2009 | 1/18/2010 |
| 1/25/2008 | 2/17/2009 | 1/19/2010 |
| 1/26/2008 | 2/22/2009 | 1/20/2010 |
| 1/27/2008 | 2/23/2009 | 1/21/2010 |
| 1/28/2008 | 2/26/2009 | 1/22/2010 |
| 1/29/2008 | 3/1/2009 | 1/23/2010 |
| 1/31/2008 | 3/2/2009 | 1/24/2010 |
| 2/1/2008 | 3/3/2009 | 1/25/2010 |
| 2/2/2008 | 3/4/2009 | 1/26/2010 |
| 2/3/2008 | 3/5/2009 | 1/30/2010 |
| 2/20/2008 | 3/16/2009 | 2/4/2010 |
| 2/21/2008 | 4/7/2009 | 2/5/2010 |
| 2/22/2008 | 4/8/2009 | 2/6/2010 |
| 2/23/2008 | 4/9/2009 | 2/9/2010 |
| 2/24/2008 | 5/1/2009 | 2/23/2010 |
| 4/23/2008 | 5/2/2009 | 2/24/2010 |
| 5/24/2008 | 5/3/2009 | 2/26/2010 |
| 10/31/2008 | 5/5/2009 | 2/27/2010 |
| 11/1/2008 | 6/3/2009 | 3/2/2010 |
| 11/2/2008 | 9/14/2009 | 3/3/2010 |
| 11/3/2008 | 10/13/2009 | 3/4/2010 |

Notice of Violations and Intent to File Suit

| | | |
|---|---|---|
| 3/10/2010 | 12/29/2010 | 6/28/2011 |
| 3/12/2010 | 12/31/2010 | 10/4/2011 |
| 3/31/2010 | 1/1/2011 | 10/5/2011 |
| 4/2/2010 | 1/2/2011 | 11/5/2011 |
| 4/4/2010 | 1/13/2011 | 11/8/2011 |
| 4/5/2010 | 1/29/2011 | 11/9/2011 |
| 4/12/2010 | 1/30/2011 | 11/10/2011 |
| 4/20/2010 | 2/14/2011 | 11/11/2011 |
| 4/27/2010 | 2/15/2011 | 11/12/2011 |
| 5/9/2010 | 2/16/2011 | 11/13/2011 |
| 5/10/2010 | 2/17/2011 | 11/19/2011 |
| 5/17/2010 | 2/18/2011 | 11/20/2011 |
| 5/25/2010 | 2/19/2011 | 11/24/2011 |
| 5/26/2010 | 2/24/2011 | 1/19/2012 |
| 5/28/2010 | 2/25/2011 | 1/20/2012 |
| 10/22/2010 | 3/2/2011 | 1/22/2012 |
| 10/23/2010 | 3/5/2011 | 1/23/2012 |
| 10/24/2010 | 3/6/2011 | 2/7/2012 |
| 10/29/2010 | 3/13/2011 | 2/12/2012 |
| 11/7/2010 | 3/15/2011 | 2/14/2012 |
| 11/10/2010 | 3/17/2011 | 2/29/2012 |
| 11/20/2010 | 3/18/2011 | 3/13/2012 |
| 11/21/2010 | 3/19/2011 | 3/14/2012 |
| 11/23/2010 | 3/20/2011 | 3/16/2012 |
| 11/27/2010 | 3/22/2011 | 3/24/2012 |
| 12/3/2010 | 3/23/2011 | 3/25/2012 |
| 12/5/2010 | 3/24/2011 | 3/27/2012 |
| 12/6/2010 | 3/25/2011 | 3/31/2012 |
| 12/8/2010 | 3/26/2011 | 4/10/2012 |
| 12/9/2010 | 4/7/2011 | 4/11/2012 |
| 12/14/2010 | 4/25/2011 | 4/12/2012 |
| 12/17/2010 | 5/14/2011 | 7/31/2012 |
| 12/18/2010 | 5/16/2011 | 10/6/2012 |
| 12/19/2010 | 5/17/2011 | 10/22/2012 |
| 12/20/2010 | 5/25/2011 | 10/25/2012 |
| 12/21/2010 | 5/28/2011 | 10/31/2012 |
| 12/22/2010 | 5/31/2011 | 11/1/2012 |
| 12/25/2010 | 6/1/2011 | |
| 12/26/2010 | 6/4/2011 | |
| 12/28/2010 | 6/5/2011 | |